CLARK *v.* GRISHAM, et al.

Jan. 11, 1954

No. 39007 48 Adv. S. 4 69 So. 2d 376

*Hugh N. Clayton,* New Albany; *Thos. E. Pegram,* Ripley, for appellant.

*Robert B. Smith,* Ripley, for appellees.

ROBERDS, P. J.

On or before March 27, 1951, Osmond L. Clark, the appellant, owned 240 acres of land located in Tippah County, Mississippi. He lived in Oklahoma. G. G.

Grisham and his three sons were residents of said County, and, under the firm name of G. G. Grisham and Sons, were engaged in buying timber, converting it into lumber and crossties, and selling the finished product. On said date these parties entered into a sale-purchase contract of the merchantable timber located on said land, expressly excepting from said sale and purchase the poplar and cypress and specified seedlings. The Court Reporter will set out the contract as a footnote hereto, omitting the acknowledgments.[1]

---

[1] TIMBER CONTRACT

This contract made and entered into this the 27th day of March, 1951, by and between Osmond L. Clark of the First Part, and G. G. Grisham and Sons, a partnership composed of G. G. Grisham, Norman Grisham, Bowden Grisham and Victor Grisham, as Parties of the Second Part, WITNESSETH:

That the First Party owns 240 acres of land located in the southern part of Tippah County, MISSISSIPPI, being the Old Clark Homestead, and being the only land owned by him in Tippah County, Mississippi, on which is located a large quantity of merchantable pine and hardwood timber, which he proposes to sell to the Second Parties, and which they propose to purchase.

Therefore for and in consideration of the sum of Six Thousand ($6,000.00) Dollars, to him cash in hand paid, receipt of which is hereby acknowledged, on the terms and conditions and of this sale are as follows:

(1) The Second Parties are to pay to the First Party the sum of Twenty ($20.00) Dollars per thousand feet for each and every thousand feet of timber cut by them on said land, the $6,000.00 mentioned above simply being a down-payment on the timber, and not the total purchase price. The timber is to be transported and delivered by the SECOND Parties to the Ripley Lumber Company yard at Ripley, Mississippi, where it is to be scaled and checked, and the measurement so made is to be accepted as the basis on which payment for same shall be made to the First Party, except as to cross-ties hereinafter mentioned. Any cross-ties cut from said timber are to be delivered to Wyoming Tie and Timber Company at Ripley, Mississippi, or some other cross-tie yard to be mutually agreed upon by and between said parties. Each week the Second Parties are to pay to The Peoples Bank of Ripley, Mississippi, the sum of $20.00 per thousand feet on each thousand feet of lumber or cross-ties delivered that week as aforesaid, and $12.00 of this $20.00 per thousand feet is to be credited by the Peoples Bank to the account of the First Party, the remaining $8.00 is to be handled for the benefit of the Second Parties at said bank, and either paid to the bank on their obligations or credited to their account in accordance with their agreement with said bank. The $8.00 out of each $20.00 per thousand feet for which the Second Parties shall be credited, shall be credited against the advance of $6,000.00 this day paid by the Second Parties to the First Party, as a part of the purchase price of said tim-

The Grishams deposited $6,000 to the credit of Clark as provided in the contract, and, shortly after its execution moved their sawmill onto the land and began the cutting and removal of the timber therefrom. On or about August 11, 1951, the Grishams ceased their operations and removed their mill from said premises.

In October, 1951, the Grishams filed their bill in this cause, alleging they had cut and removed 352,910 feet of timber and had deposited to the direct credit of Clark

ber. If and when said $8.00 per thousand feet so deducted and credited shall aggregate $6,000.00, then on any timber cut thereafter, the First Party shall receive credit at the bank for the entire $20.00 per thousand. When the timber to be cut, as hereinafter described, has all been cut and sold, if $8.00 per thousand feet credited against said $6,000.00 advance payment, does not aggregate as much as $6,000.00, the First PARTY hereby agrees to reimburse the Second Parties or their assignee for the difference.

(2) In cutting and harvesting the timber on said land, the Second Parties, their heirs or assigns, shall leave on said land at least four (4) pine seed trees per acre, which shall be in size of ten (10″) inches or larger, where there are that many trees of that size on an acre, and in addition shall leave all pine timber eight (8″) inches or under in diameter, and all hardwood timber fourteen (14″) inches or under in diameter.

(3) The timber which is sold by the First Party hereby to the Second Parties is all of the pine timber located on said 240 acres of land, which is more than eight (8″) inches in diameter, six (6″) inches from the ground, except the seed trees hereinbefore mentioned; and all hardwood timber more than fourteen (14″) inches in diameter, six (6″) inches from the ground, except that there is no poplar or cypress conveyed hereby, as the poplar and cypress is not being sold.

(4) In consideration as above the Second Parties, their heirs or assigns, are hereby given eighteen (18) months from this date in which to cut and remove said timber, together with the right of ingress and egress in and upon and over said 240 acres of land for themselves, their employees, trucks, equipment and machinery, and suitable and sufficient mill cites and storage yards on said land for the cutting, manufacturing and storing of said timber. It is agreed, however, that when the Parties of the Second Part once begin to cut said timber, that they will not move their mills to any other location until they have concluded the cutting of said timber.

IN WITNESS WHEREOF, we hereunto affix our signatures this the 27th day of March, 1951.

/s/ Osmond L. Clark
 FIRST PARTY
/s/ G. G. Grisham
/s/ Norman Grisham
/s/ Bowden Grisham
/s/ Victor Grisham
 SECOND PARTIES

$4,224.92, which aggregated $12.00 per thousand for the timber they had cut, and had also deposited to the credit of the six thousand dollar fund the sum of $2,823.28, which left Clark owing them out of said deposited fund $3,176.72. They alleged they had performed their contract and Clark owed them the last stated amount, and they sued out an attachment against said 240 acres of land, asked for a decree for said amount and for a sale of the land and application of the proceeds to the payment of said sum.

Clark filed an answer and cross bill. He denied the Grishams had fulfilled their contract. He said they were under obligation to cut all of the merchantable timber, except the seedlings and poplar and cypress; that they had not done so; that they had picked out and removed the choicest trees and left those not so valuable and desirable; that they had left a considerable quantity of merchantable logs lying on the ground; that the tract contained 850,000 feet of merchantable timber, not including that expressly excepted from the contract, and that had the Grishams performed their contract they would have owed Clark between six and seven thousand dollars. He prayed for a discovery of the names of those to whom the Grishams had sold the lumber cut from said land, and the quantity sold each person and for a personal decree against the Grishams for the sum of $6,571.08.

The Grishams, in their answer to the cross bill, denied there was upon the land the quantity of merchantable timber claimed in the cross bill; they alleged they had marketed all of the merchantable timber on the land. They admitted they had not cut any hickory timber but said the contract bound, and limited, them to the sale of timber to the Ripley Lumber Company, except the crossties, which were to be sold to the Wyoming Tie and Timber Company at Ripley, and that Ripley Lumber Company would not purchase hickory timber. They ad-

mitted they had left some twenty-five to thirty logs on the ground, but said they were unmarketable.

The learned chancellor construed the contract to convey to the Grishams only such timber as they desired to cut and remove. He held they could select and cut timber in such quality and quantity as they desired; that they were under no obligation to cut, remove and pay for all of the merchantable timber (excepting the seedlings, poplar and cypress as provided in the contract). As the opinion expressed it, "The contract doesn't say that he (the Grishams) has to cut all of the timber, but he has to pay $20.00 a thousand for all he cuts." In other words, that Grisham could select, cut and remove such trees as they desired and quit when it suited them to do so. He also held that the contract obligated, and limited, the Grishams to sale of the lumber to the Ripley Lumber Company and the crossties to Wyoming Tie and Timber Company. He found the Grishams had cut 352,910 feet; that they had paid Clark therefor at the rate of $20.00 per thousand feet, amounting to $7,058.20, by direct payment to Clark of $4,234.92, and credit to the six thousand dollar advance account of $2,823.28, which left Clark under obligation to repay the Grishams $3,176.72 out of the advance payment account. But he also found that the Grishams had cut and left lying in the woods merchantable logs to the extent of 3,586 feet, and he charged them $71.22 therefor. He then entered a personal decree against Clark in the sum of $3,105.50. From the foregoing holdings and decree Clark appeals.

In our view this was a sale by Clark and a purchase by the Grishams of all of the merchantable timber of specified sizes located upon the 240 acres of land, excluding the poplar, cypress and seedlings expressly accepted from the sale. The contract, by its express terms, so designates the transaction. In the first paragraph the contract says Clark "proposes to sell to the Second

Parties, and which they propose to purchase.'' In the second paragraph it recites ''* * * the First Party sells to the Second Parties, their heirs or assigns, all of the merchantable timber located on said 240 acres of land.'' Again it says, ''The terms and conditions of this sale are as follows,'' then setting out the terms and conditions. It provides that the deposit of $6,000 is a ''down-payment on the timber, and not the total purchase price.'' Another paragraph provides that the Grishams ''In cutting and harvesting the timber on said land,'' shall leave the seedlings, poplar and cypress. Paragraph (3) says the timber ''sold'' by Clark to the Grishams ''is all of the pine timber'' and ''all hardwood timber'' of certain sizes located upon the land, excepting poplar, cypress and the seedlings.

While the express terms of the contract control, the circumstances surrounding the parties and the subject matter of the contract are to be considered in trying to ascertain its meaning. Clark lived in Oklahoma. He was never here while the Grishams were removing the timber. It would appear to be a very foolish thing on his part to agree that the Grishams could go into this tract of timber and select out the best trees and leave whatever they desired. We should not attribute to him so unwise an act, and vest in the second parties such a great advantage, unless the contract clearly does both.

Nor do we think the contract limits the sale of the timber, other than crossties, to the Ripley Lumber Company. It explains that the purpose of this provision was for the lumber to be there scaled and checked, ''and the measurement so made is to be accepted as the basis on which payment for same shall be made to the 'First Party,' '' except as to the crossties. It appears that the Ripley Lumber Company was a recognized reliable concern, and it is understandable that Clark, who resided in another state, would want some protection as to the

quantity of lumber cut and removed from the land by the Grishams. He was willing to rely upon the Ripley Lumber Company. And to show conclusively the Grishams did not understand the contract obligated them to sell all of the timber to Ripley Lumber Company the contract conveyed to the Grishams the hickory timber, and they admitted they knew Ripley Lumber Company did not buy hickory logs or lumber. Seemingly the parties assumed that all of the timber other than crossties and hickory would be purchased by Ripley Lumber Company, but the contract did not limit such sale to that concern. However, had the contract contained such a limitation, Grisham would not have been injured for the reason that Company did purchase all that Grisham cut and removed, except the crossties, and was ready to buy the rest of it other than crossties and hickory.

The Grishams admit they did not cut any hickory. Hickory was, of course, included within hardwood. Apparently there was upon the land some fifty thousand feet of merchantable hickory. As stated, the Grishams admitted they knew Ripley Lumber Company did not deal in hickory timber. But, aside from that, it is shown that another concern, practically as accessible to this tract of timber as was the Ripley Lumber Company, was purchasing hickory lumber during the time provided for removal of the timber under this contract, and was advertising that fact throughout the county in the county newspaper.

The Wyoming Tie and Timber Company of Ripley was ready to buy the crossties. There is no issue on that.

The chancellor did not adjudicate the quantity of merchantable timber, including the hickory, uncut and unremoved and unpaid for by the Grishams. The cause will have to be remanded for such finding and for ad-

540

justment of the rights and equities of the parties under the holdings herein announced.

Reversed and remanded.

*Kyle, Lee, Holmes* and *Ethridge, JJ.*, concur.