618 So.2d 76 (1993)
H.J. HENDRICK
v.
William T. GREEN.
No. 90-CA-0865.
Supreme Court of Mississippi.
March 18, 1993.
Rehearing Denied June 3, 1993.
Matthew Harper, Harper Braham & Associates, Laurel, for appellant.
John L. Jeffries, Laurel, for appellee.
Before HAWKINS, C.J., and SULLIVAN and McRAE, JJ.
HAWKINS, Chief Justice, for the Court:
H.J. Hendrick appeals from a judgment entered in the chancery court of Jones County dismissing his complaint against William T. Green for specific performance or alternatively, damages for breach of contract to purchase corporate shares from Hendrick. Because the chancellor was manifestly wrong as a matter of law in holding the contract was impossible to perform, we reverse.

FACTS
Around the first of April, 1989, Hendrick, a retired businessman living in Baton Rouge, Louisiana, contacted Green, a resident of Laurel, Mississippi, regarding the sale of 45,000 corporate shares in Southeastern Savings Bank of Laurel (Southeastern) owned by Hendrick. Green was a major shareholder and member of the board of directors of Southeastern. Following discussion between the two, on April 5, 1989, Green wrote Hendrick:
It is my understanding that you have entered into an agreement with Larry V. Glorioso and/or Mildred F. Glorioso whereby the Gloriosos have agreed to provide you with 45,000 shares of common stock in Southeastern Savings Bank as security for a loan held by you from Larry V. Glorioso.
In the event such stock is forwarded to you, I hereby offer to pay you the sum of two and no/100 Dollars ($2.00) per share for the entire 45,000 shares, or a total of Ninety Thousand and no/100 Dollars ($90,000.00). I do not desire to purchase any less than the full 45,000 shares.
I will purchase this stock from you on or before April 24, 1989, in one of the following manners:
a) Cash in full paid on or before April 24, 1989;
b) Thirty Thousand and no/100 Dollars ($30,000.00) cash together with my promissory note in the amount of Sixty Thousand *77 and no/100 Dollars ($60,000.00) at 12% per annum from date. Principal of Three Thousand and no/100 Dollars ($3,000.00) plus interest being payable in quarterly installments over a period of five (5) years. No penalty for prepayment. I will provide security agreeable to you.
In the event you accept this offer, please notify me on or before April 14, 1989.
The purpose of Green's acquiring Hendrick's shares was to become a majority shareholder in Southeastern. When Green wrote Hendrick, he was aware that approval was required from both federal and state regulatory agencies. Green thought that he had already obtained approval from the Federal Home Loan Bank (F.H.L.B.), a federal regulatory agency, to become a majority shareholder and have control of the corporation.[1]
Apparently Green recognized that approval would not be promptly forthcoming, and on April 24, 1989, Green again wrote Hendrick, enclosing a check for ten thousand dollars ($10,000.00):
Pursuant to our agreement of today, enclosed is my check in the amount of Ten Thousand and no/100 Dollars ($10,000.00).
This check is given to you in partial payment for Southeastern Savings Bank stock, and it is to be deducted from the amount of cash referred to in my letter of April 5, 1989.
As you have been advised, before I can purchase all of the stock, it is necessary for my attorneys to clear this matter with the state regulatory agency.
By acceptance of these funds, you have agreed to cooperate with me in procuring state approval, after which time we will consummate this transaction. Your acceptance also extends the April 24, 1989, deadline to a reasonable time not to exceed ninety (90) days hereafter to clear this matter with the state.
Hendrick accepted this offer by cashing the check.
On April 27, 1989, Green wrote a letter to F.H.L.B. in Dallas, seeking approval for obtaining the controlling interest through purchasing various shares. In pertinent part, the letter stated:
My attorneys have reviewed this matter and have come to the initial conclusions that additional change of control applications do not appear to be necessary as I have already been approved. It is my understanding that your department has also reviewed my present situation, taking into regard the previous change of control, and has determined that no further application or notice is required of me. I will appreciate your acknowledging this understanding by signing, dating and returning a copy of this letter to me in the enclosed stamped, self-addressed envelope.
F.H.L.B. never acknowledged receipt of this letter.
On August 23, 1989, Green filed his plan with F.H.L.B. seeking approval to become a majority shareholder.
Recognizing that he was having difficulty obtaining approval, Green sought to amend the terms of the two previous letters through an escrow agreement which his attorney prepared and dated September 19, 1988, but Hendrick refused to sign.
On September 20, 1989, the Office of Thrift Supervision (O.T.S.) wrote Green a detailed letter stating that Green's application was materially incomplete pursuant to 12 C.F.R. 574 (1989). This letter also discussed the areas where additional information was needed. O.T.S. determined that the business plan, compensation plan, the stock acquired through foreclosure, and capital restoration plan needed to be expanded and detailed. As a result of these omissions, the application was withdrawn.
The record does not contain any evidence concerning what, if any, additional steps were taken by Green in order to conform with the guidelines set forth by the O.T.S.
*78 On December 8, 1989, Hendrick filed a complaint against Green for specific performance of the contract, or in the alternative damages for breach of contract. On April 18, 1990, Chancellor John Shannon Clark of the Chancery Court of Jones County heard testimony from H.J. Hendrick, William T. Green and Susan Wood.
At trial, Green maintained that Hendrick abstained from voting his 45,000 shares at the February 13, 1990, meeting of the shareholders of Southeastern for the purpose of increasing the authorized number of corporate shares from one million (1,000,000) shares to six million (6,000,000) shares.[2] Green further claimed that this abstention removed any possibility of his obtaining the majority of shares.
Hendrick on the other hand, testified that he offered to give Green his proxy to vote the 45,000 shares provided that interest was paid on the amount due under the contract.
As above noted, the shareholder meeting was subsequent to suit having been filed.
Following trial on July 17, 1990, the Chancellor ruled that the contract was unenforceable due to the fact that its implementation was prohibited by law and dismissed the complaint. Hendrick has appealed.

LAW
The letters of April 5th and April 24th, 1989, along with Hendrick's accepting the offer by cashing the check constitute the contract in this case. Hendrick raises several issues on appeal, but we find only one requiring discussion, namely: whether the contract is unenforceable. We find that the Chancellor was manifestly in error in holding the contract unenforceable as a matter of law.
The mere fact that a contract becomes burdensome or even impossible to perform does not for that reason alone excuse performance. Browne & Bryan Lumber Co. v. Toney, 188 Miss. 71, 194 So. 296 (1940), involved delivery of railroad ties for a certain commission price. Subsequently, the means for delivering the entire amount of the ties became impossible. We addressed the contract language and determined that even though it became impossible for the goods to be shipped by water, that fact did not relieve the defendant from performing his contract.
When all the testimony in this case is analyzed, it means Tony made a contract with the railroad, which he did not fulfill for the reason that it became apparent to him he would incur a loss... . This Court said in the case of Piaggio v. Somerville, 119 Miss. 6, 80 So. 342, 344 [1918]: `when a party by his own contract creates a duty or charge upon himself he is bound to discharge it, although to do so should subsequently become unexpectedly burdensome or even impossible; the answer to the objection of hardship in all cases such being that it might have been guarded against by proper stipulation'. [Citations omitted.]
In the case of Harmon v. Fleming, 25 Miss. 135, 142 [1852], this Court said: `We find the common law rule, on this subject, stated in the following manner: [w]here the law casts a duty on a party, the performance shall be excused, if it be rendered impossible by the act of God. But where a party, by his own contract, engages to do an act, it is deemed to be his own fault and folly, that he did not thereby expressly provide against contingencies, and exempt himself from liability in certain events; and in such case, therefore, that is, in the instance of an absolute and general contract, the performance is not excused by an inevitable accident or other contingency, although not foreseen by, or within the control of the party'.
In the case of Piaggio v. Somerville, supra, three exceptions are recognized:
1. A subsequent change in the law, whereby performance becomes unlawful.
2. The destruction, from no fault of either party, of the specified thing, the continued existence of which is essential *79 to the performance of the contract. 3. The death or incapacitating illness of the promisor in a contract which has for its objective the rendering of personal services.
Browne, 188 Miss. at 82-83, 194 So. at 298.
Other jurisdictions have addressed the issue of impossibility of performance. In Ruff v. Yuma County Transp. Co., 690 P.2d 1296, 1298 (Colo. App. 1984), the Supreme Court of Colorado enumerated the following:
Impossibility of performance is determined by whether an unanticipated circumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract. Littleton v. Employees Fire Ins. Co., 169 Colo. 104, 453 P.2d 810 (1969). A change in economic conditions does not provide a basis for rescission of the contract. [Citations omitted.] Competition, delay in ICC approval, and changed economic circumstances are not situations which are so unforeseeable as to be outside the risks assumed under the contract.... The fact that the value of the bargain had decreased is not an excuse for non-performance. (Emphasis added.)
Ruff, 690 P.2d at 1298. Accord Cook v. Deltona Corp., 753 F.2d 1552 (11th Cir.1985), reh'g denied 763 F.2d 398 (11th Cir.1985); Harwell v. Growth Programs, Inc., 451 F.2d 240 (5th Cir.1971), opinion modified, reh'g denied 459 F.2d 461 (5th Cir. Tex. 1972); Haby v. Stanolind Oil & Gas Co., 228 F.2d 298 (5th Cir.1955); VJK Productions, Inc. v. Friedman/Meyer Productions, Inc., 565 F. Supp. 916 (S.D.N.Y. 1983); Baton Rouge Contracting Co. v. West Hatchie Drainage Dist. of Tippah County, 304 F. Supp. 580 (N.D.Miss. 1969), aff'd 436 F.2d 976 (5th Cir.1971); Chevron Oil Co. v. Clark, 291 F. Supp. 552 (S.D.Miss. 1968), aff'd in part, rev'd in part 432 F.2d 280 (5th Cir.1970); London & Lancashire Indemnity Co. of America v. Board of Comm'rs. of Columbiana County, 107 Ohio St. 51, 140 N.E. 672 (Oh. 1923); Tucker v. Bitler Bros., Inc., 197 N.Y.S.2d 899 (N.Y.Sup. 1960); City of Montpelier v. National Surety Co., 97 Vt. 111, 122 A. 484. (1923); Annotation, Modern Status of the Rules Regarding Impossibility of Performance as Defense in Action for Breach of Contract, 84 A.L.R.2d, 12, 35 (1962).
Green testified that he learned approval was contingent upon his transferring several million dollars so that the bank had adequate reserve capital. This, however, did not excuse his performing under the contract. There is nothing in either letter making governmental approval a condition precedent for his performance. Green could have expressly stipulated in his letter that if he was unable to fulfill governmental requirements, performance would be excused. Having set forth no such condition, he was obligated to fulfill the contract. We therefore reverse.
Upon remand, the Chancellor should determine whether Hendrick has an adequate remedy at law by assessment of damages for breach of contract, or specific performance is warranted. See Mid-Continent Telephone Corp. v. Home Telephone Co., 319 F. Supp. 1176 (N.D.Miss. 1970); Osborne v. Bullins, 549 So.2d 1337 (Miss. 1989); Roberts v. Spence, 209 So.2d 623, 625 (Miss. 1968), citing Bomer Bros. v. Canaday, 79 Miss. 222, 30 So. 638, L.R.A. 328 (1901); 49 Am.Jur. Specific Performance § 125 (1943).
REVERSED AND REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.
SULLIVAN, McRAE, ROBERTS and SMITH, JJ., concur.
DAN M. LEE, P.J., dissents with written opinion joined by PRATHER, P.J., and PITTMAN and BANKS, JJ.
DAN M. LEE, Presiding Justice, dissenting:
With deference to today's majority, I must dissent. I cannot join in the majority's conclusion that proper governmental approval was not intended to be a condition precedent to this contract. It seems clear to me that both parties understood the *80 importance of such approval, and neither anticipated performance unless the condition could be satisfied. With that said, I would remand this case for a determination of whether Green made a good faith effort to satisfy the condition.
I preface this opinion by stating that I find no fault in the majority's explication of the law related to impossibility of performance. That doctrine acts to excuse performance in certain limited circumstances. I agree that it should not do so in this case. However, I fail to see why this issue is the "only one requiring discussion."
A condition precedent may be a condition which must be performed before the agreement of the parties becomes binding or it may be a condition which must be fulfilled before a duty to perform arises under an existing contract. See Mid-Continent Tel. Corp. v. Home Tel. Co., 319 F. Supp. 1176 (N.D.Miss. 1970); 17A C.J.S. Contracts § 338 (1963).
In interpreting contracts, our ultimate goal must always be to effectuate the intent of the parties. Kight v. Sheppard Bldg. Supply, Inc., 537 So.2d 1355 (Miss. 1989). Ordinarily, such intent may be discerned from the "four corners" of a written contract. Occasionally, however, when what the parties have written is less than clear and definite on material matters, we must resort to matters outside the document itself to learn what the parties intended. See UHS-Qualicare, Inc. v. Gulf Coast Community Hosp., Inc., 525 So.2d 746 (Miss. 1987). In this situation, all the circumstances surrounding the parties and the subject matter of the contract are to be considered if relevant to determining what the parties intended. See Barnett v. Getty Oil Co., 266 So.2d 581 (Miss. 1972); Clark v. Grisham, 219 Miss. 532, 69 So.2d 376 (1954); Williams v. Batson, 186 Miss. 248, 187 So. 236 (1939); Sumter Lumber Co. v. Skipper, 183 Miss. 595, 184 So. 835 (1938).
The majority is in agreement that the letter dated April 24, 1989, was part of the contract between the parties. That letter contained the following language:
As you have been advised, before I can purchase all of the stock, it is necessary for my attorneys to clear this matter with the state regulatory agency.
By acceptance of these funds, you have agreed to cooperate with me in procuring state approval, after which time we will consummate this transaction.

(emphasis added).
I consider this language sufficient to expressly condition Green's obligation upon the procurement of governmental approval. At the very least, substantial ambiguity is created as to the existence of a condition precedent. Under these conditions, consideration of all the circumstances surrounding the parties and the subject matter is necessary and proper.
The most obvious relevant circumstance is the existence of extensive federal and state regulations governing the ownership of similar stock. It is unthinkable that compliance with such regulations is not foremost in the mind of any party contemplating purchase or sale of affected shares. Indeed, compliance is such a central concern that I would scarcely be surprised if investors without the baggage of formal legal training neglected to mention it at all. Simply put, it is a given, understood and assumed by the parties.
In this case, however, the contract does mention the necessity of approval. On these facts, I have absolutely no difficulty interpreting the language to be a condition precedent to Green's obligation to perform. The chancellor undoubtedly recognized it as such when he held, "Both parties were aware of this pre-condition to performance and agreed to it."
The inquiry does not end here however, because of that "principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure." Morris v. Macione, 546 So.2d 969, 971 (Miss. 1989).
The chancellor decided this case under the rubric of illegality: "The Court finds that the agreement between Green and Hendrick is unenforceable since its implementation *81 is prohibited by law." On appeal Green points out:
It is a general rule of contracts that an agreement which cannot be performed without a violation of the law is illegal and void.
The majority does not address the legal basis of the lower court's holding. However, in my view both the Chancellor and the appellee overlooked another basic rule of contract law which establishes:
Where a contract could have been performed in a legal manner as well as in an illegal manner, it will not be declared void because it might have been performed in an illegal manner, since bad motives are never to be imputed to any person where fair and honest intentions are sufficient to account for his or her conduct.
17 AmJur2d, Contracts § 159. In this case there is no question that the contract could have been performed legally and that the parties had honest intentions. Therefore, reliance on the rules excusing performance due to illegality was misplaced.
The true issue in this case is whether Green made a good faith effort to obtain the approval necessary to require his performance. Unfortunately, the misapplication of the illegality defense precluded a finding on this issue. The record seems to indicate substantial effort on his part but the conflicting testimony is sufficient to preclude rendering judgment. For this reason, the case should be reversed and remanded for determination of whether Green did in fact exert the effort necessary to establish that he sought approval in good faith.
PRATHER, P.J., and PITTMAN and BANKS, JJ., join this dissent.
NOTES
[1] Green based this upon a letter from the F.H.L.B. dated December 31, 1982, which stated that the Federal Savings and Loan Insurance Corporation did not intend to disapprove his proposed acquisition of control.
[2] The breakdown of the shareholder vote demonstrated that 289,432 shares were voted in favor of the increase while 256,676 shares opposed the increase.