# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-CA-00745-SCT

*CITY OF STARKVILLE*

*v.*

*4-COUNTY ELECTRIC POWER ASSOCIATION*

| | |
|---|---|
| DATE OF JUDGMENT: | 1/15/1999 |
| TRIAL JUDGE: | HON. ROBERT L. LANCASTER |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | DEWITT T. HICKS, JR. |
| | WILLIAM DEAN STARK |
| | MARC DARREN AMOS |
| ATTORNEYS FOR APPELLEE: | DAVID L. SANDERS |
| | JEFFREY JOHNSON TURNAGE |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND REMANDED - 01/10/2002 |
| MOTION FOR REHEARING FILED: | 1/24/2002; denied 2/28/2002 |
| MANDATE ISSUED: | 3/7/2002 |

**EN BANC.**

**DIAZ, JUSTICE, FOR THE COURT:**

¶1. This matter inquires into the continued validity of a contractual arrangement between the City of Starkville (the City) and 4-County Electric Power Association (4-County) which was entered into at a time when the City had a right of eminent domain to acquire power association properties upon annexation. During the course of the contractual arrangement, the City's right of eminent domain was removed by law. We conclude that the contract is valid and enforceable within the bounds of the regulatory powers of the Public Service Commission. Accordingly, we reverse the judgment of the chancery court and remand this matter to that court for further proceedings.

## I.

¶2. In 1963, the City and 4-County agreed in a Service Area Agreement that upon the City's annexation of property within 4-County's service area, the City would either purchase 4-County's service rights and distribution facilities or grant 4-County a franchise. Following an annexation in 1994, the City attempted to purchase 4-County's rights and facilities. 4-County refused, contending that changes in the law had invalidated the agreement. The City sought to specifically enforce the agreement in the Oktibbeha County

Chancery Court. The chancery court granted summary judgment in favor of 4-County, finding that the agreement was invalid.

¶3. In 1956, the Mississippi Legislature adopted the Public Utilities Act of 1956 which authorized the Public Service Commission to regulate certain public utilities which had until that point remained largely unregulated. For purposes of this discussion, the relevant portion of the Act is that provision which granted municipalities an unlimited right of condemnation. It provided that "[a]ny municipality shall have the right to acquire by purchase, negotiation or condemnation the facilities of any utility that is now or may hereafter be located within the corporate limits of such municipality." 1956 Miss. Laws, ch. 372, § 5(e), codified at Miss. Code Ann. § 77-3-17 (1972).

¶4. On December 31, 1963, the City and 4-County entered into a Service Area Agreement which provided that, in the event of an annexation, the City would have the option of either purchasing 4-County's service rights and distribution facilities or to grant 4-County a franchise to provide power to the newly annexed area. The relevant provisions of the agreement stated that:

> In the event Municipality at any time or from time to time changes the location of its corporate boundaries in such manner as to enclose within said boundaries an area of service, distribution facilities and/or consumers of Cooperative, Municipality shall, within one-hundred twenty (120) days after annexation becomes effective, elect either to (a) grant Cooperative a franchise without cost to serve all present and future electric consumers within said annexed area for a period of twenty (20) years or (b) buy all of Cooperative's services rights and the associated distribution facilities within the annexed area, with such exceptions as may be agreed upon by the parties. If Municipality elects to buy, it shall be obligated to purchase, and Cooperative shall be obligated to sell to Municipality, said service rights and facilities at a fair value determined as hereinafter provided.

4-County maintains that its intent in entering into the agreement was to avoid the costs of litigation necessarily associated with an eminent domain proceeding when the loss of its rights and facilities was inevitable under then-existing law. The contract, however, does not mention eminent domain or in any way condition the mutual promises upon its availability.

¶5. On March 17, 1987, over the Governor's veto, the Mississippi Legislature passed Senate Bill No. 2840, amending Miss. Code Ann. §§ 77-3-13, -17, & -21 (2000) concerning the regulation of public utilities. As amended, Section 77-3-17 specifically provided that prior to a municipality exercising the power of eminent domain against a utility, the certificate of public convenience and necessity held by the utility had to be canceled by the Public Service Commission.[1] Moreover, the amended statute required that before the Commission could cancel a certificate of public convenience and necessity, it must first find that the utility was *not* providing "reasonably adequate service" and give the utility an opportunity to cure any deficiencies. Only if the utility failed to correct problems noted by the Commission could its certificate then be canceled.

¶6. On November 7, 1994, 4-County informed the City that it considered the agreement invalid and would no longer honor it. It explained, "[t]he sole purpose for this 'Agreement' was to accommodate the City's absolute right of condemnation that then existed and avoid protracted litigation to determine value by establishing the 'Tennessee Formula' as the methodology for determining value. In view of the substantial change in the City's power of condemnation implemented by the 1987 statutory amendments, the Service Area Agreement is invalid and no longer enforceable . . . ." Following an annexation by the City in 1995, it

informed 4-County that it intended to exercise its option to purchase 4-County's service rights and associated distribution facilities within the newly annexed area. 4-County again declared the agreement invalid and refused to convey its rights and facilities.

¶7. On April 7, 1995, the City filed suit in the Oktibbeha County Chancery Court seeking to specifically enforce the Service Area Agreement. The chancery court granted summary judgment in favor of 4-County, finding that the agreement was invalid. The City of Starkville appeals from that judgment.

## II.

¶8. The Court employs a de novo standard of review to a trial court's grant of summary judgment. *Rockwell v. Preferred Risk Mut. Ins. Co.*, 710 So. 2d 388, 389 (Miss. 1998). Summary judgment is appropriate if the evidence before the Court -- admissions in the pleadings, answers to interrogatories, depositions, affidavits, etc. -- shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Id.* The evidence must be viewed in the light most favorable to the party against whom the motion has been made. If, in this view, there is no genuine issue of material fact and, the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his favor. Otherwise, the motion should be denied. *McCullough v. Cook*, 679 So. 2d 627, 630 (Miss. 1996).

### a.

¶9. The overarching concern in this litigation is whether the contract at issue remains valid and enforceable despite the removal of the right of eminent domain, which was probably the motivating factor for 4-County's decision to enter into the agreement. We answer that question in the affirmative.

¶10. The record indicates that Starkville and 4-County Electric entered into a contract with which they honored for more than thirty years. This Service Area Agreement provided that in the event of Starkville's annexation of property within 4-County's service area, Starkville would purchase, and 4-County would sell, 4-County's service assets in that area at a price to be determined by a formula set forth in the agreement or, alternatively, Starkville would grant a franchise to 4-County at no cost. This Agreement served as a valid contract, supported by consideration and with definite terms, between the two parties. *Merchants & Farmers Bank v. State ex rel. Moore*, 651 So.2d 1060, 1061 (Miss.1995) (A court is obligated to enforce a contract executed by legally competent parties where the terms of the contract are clear and unambiguous); *Lowndes Co-op. Ass'n v. Lipsey*, 240 Miss. 71, 126 So.2d 276, 277-78 (1961) (Consideration for a promise is (a) an act other than a promise, or (b) a forbearance, or (c) the creation, modification or destruction of a legal relation, or (d) a return promise, bargained for and given in exchange for the promise).

¶11. It is argued that subsequently enacted legislation, Miss. Code Ann. § 77-3-17 (2000), altered the relationship of the two parties and invalidates the contract. As we see it, nothing in this legislation speaks to the existing contractual arrangement. Nothing in the contract between the parties mentioned eminent domain or conditions the contract upon the power or exercise of eminent domain. Nothing in the record supports the inference that this was the basis for the contract.

¶12. This Court has stated:

In construing a written instrument, the task of courts is to ascertain the intent of the parties from the

four corners of the instrument. Courts look at the instrument under consideration as a whole and determine what the parties intended by giving a fair consideration to the entire instrument and all words used in it. When a written instrument is clear, definite, explicit, harmonious in all its provisions, and is free from ambiguity, a court in construing it will look solely to the language used in the instrument itself.

*Pfisterer v. Noble*, 320 So.2d 383, 385 (Miss. 1975). It follows that, the mere fact that the City no longer had an absolute right to eminent domain, which may have prompted 4-County Electric to enter into the Contract, does not render the contract void.

¶13. This Court has previously determined contracts void based on fraud and illegality. *See, e.g., Dill v. Southern Farm Bureau Life Ins.*, 797 So.2d 858, 866 (Miss. 2001) (stating that if an insurance company proves that it was misled in providing coverage under certain circumstances, it can deny benefits because the insurance contract is void due to fraud); *Smith v. Simon*, 224 So.2d 565, 566 (Miss. 1969) (This Court adjudging that contracts are void only when illegality is clearly shown). We have never, however, found a contract void based on the motivation for entering the contract changing and do not do so here.

¶14. If the Legislature wishes to invalidate existing contracts between entities delivering public utilities, it should say so plainly. It has not done so in the legislation here at issue, and there is no just reason for this Court writing legislation which is not there. The Legislature is the foremost expositor of public policy. *Mississippi Power & Light Co. v. Lumpkin*, 725 So.2d 721, 724 (Miss. 1998); *Daniels v. Harrison County Bd. of Sup'rs*, 722 So.2d 136, 141 (Miss. 1998)(Banks, P.J., specially concurring).

¶15. For many years, eminent domain in these premises, unfettered by any reference to the Public Service Commission, was in fact the public policy. This contract, and perhaps others, were entered into during that period. If public policy now dictates that these contracts be voided, it is for the Legislature, not this Court, to say so.

¶16. We now address in turn, the other grounds upon which the chancellor relied.

**b.**

*1. Impossibility/Impracticability*

¶17. 4-County argues that its obligations under the contract have been discharged under the doctrine of "supervening impracticability." It relies upon the Restatement (Second) of Contracts § 261 "Discharge by Supervening Impracticability" (1981) which provides,

[w]here, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

4-County further notes that passage of a legislative enactment is one of the specific instances in which performance under a contract may be rendered impracticable. Section 264 of the Restatement states "[i]f the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a

basic assumption on which the contract was made." The governmental regulation or order to which § 264 speaks "may emanate from any level of government and may be, for example, a municipal ordinance or an order of an administrative agency. Any governmental action is included and technical distinctions between 'law,' 'regulation,' 'order' and the like are disregarded. . . ." Restatement (Second) of Contracts § 264 cmt. b (1981).

¶18. 4-County maintains that the 1987 amendments to the §§ 77-3-17 and 77-3-21 were not within either parties' contemplation when they entered into the agreement. It notes that in 1963, at the time of contract formation, the City possessed an *unqualified* right of eminent domain. 4-County claims it entered into the agreement with the City solely to avoid the expense and hassle associated with condemnation proceedings when loss of its rights and facilities was unavoidable. Now that the City's right is no longer absolute, 4-County maintains it should not be forced to sell its service rights and distribution facilities. Accordingly, it seeks a discharge from its obligations under the contract.

¶19. There are no Mississippi cases recognizing the doctrine of impracticability.[2] However, in ***Piaggio v. Somerville***, 119 Miss. 6, 80 So. 342 (1919), this Court discussed the doctrine of impossibility as relieving a party from his duties under a contract. In that case, the owner of a ship entered into an agreement, or "charter party," with a transport company to deliver a cargo of lumber to Europe. *Id.* at 343. The transport company later assigned its rights and obligations under the contract to another party who in turn assigned its rights to the plaintiff, Somerville. *Id.* The plaintiff then assigned his rights to the defendant, Piaggio, in consideration of $7,500 "payable in cash . . . on clearance of [the] vessel at Mobile, Alabama . . . ." *Id.* The owners of the vessel would not let it sail to the designated ports in Europe because of the unrestricted submarine warfare then being conducted by Germany. *Id.* Somerville sued Piaggio, seeking to recover the $7,500 due him under the contract. Piaggio argued that clearance of the vessel at Mobile was a condition precedent to his duty to pay Somerville. Piaggio argued he could not have enforced the contract's performance, because "the owners of the vessel [were] released from the obligation of the charter party because of the danger of being sunk by a German submarine to which the vessel would have been subjected had it attempted to make the voyage." *Id.*

¶20. The trial court found in favor of Somerville, and this Court affirmed, holding that the risk of submarine warfare did not excuse the vessel's owners from performing under the contract. The Court explained,

> the owners of the vessel were bound to transport the cargo of lumber as provided therein, notwithstanding the risk to the vessel of being sunk by a submarine, or pay damages for their failure so to do, for the rule is that when a party by his own contract creates a duty or charge upon himself he is bound to discharge it, although so to do should subsequently become unexpectedly burdensome or even impossible; the answer to the objection of hardship in all such cases being that it might have been guarded against by a proper stipulation.

*Id.* at 344. The Court went on to recognize that there are "certain classes of events the occurring of which are said to excuse from performance because they are not within the contract, for the reason that it cannot reasonably be supposed that either party would have so intended had they contemplated their occurrence when the contract was entered into, so that the promisor cannot be said to have accepted specifically nor promised unconditionally in respect to them." *Id.* The three classes of cases include: (1) "*a subsequent change in the law, whereby performance becomes unlawful*"; (2) "the destruction, from no default of either party, of the specific thing, the continued existence of which is essential to the performance of the

contract"; and (3) "the death or incapacitating illness of the promisor in a contract which has for its object the rendering by him of personal services." *Id.* (emphasis added). The Court held submarine warfare did not come within any of the classes of cases which would discharge the vessel owner's duties under the contract, explaining a contrary holding would necessitate the addition of a fourth category, "a subsequent foreign war or a subsequent change by one or more of the belligerents in the method of waging such a war . . . ." *Id.* at 345.

¶21. This Court reaffirmed its adherence to *Piaggio* in *Hendrick v. Green*, 618 So. 2d 76 (Miss. 1993). In order to become the majority shareholder of the Southeastern Savings Bank of Laurel, Green contracted to purchase 45,000 shares of stock in that corporation owned by Hendrick. *Id.* at 76-77. At the time of contract formation, Green was aware that federal and statute regulatory agencies' approval was required. However, he mistakenly thought he had obtained federal approval. *Id.* at 77. After attempting to obtain approval, Green withdrew his application for change of control from the Office of Thrift Supervision, the federal agency whose approval Green sought, because of various omissions. *Id.* The record revealed no evidence of additional steps taken by Green to conform his application to the guidelines set forth by the federal agency. *Id.*

¶22. Hendrick filed a complaint against Green seeking specific performance of the contract. Green claimed a subsequent vote by Southeastern's shareholders to increase the number of shares made it impossible for him to become majority shareholder. *Id.* at 78. The chancellor ruled that the contract was unenforceable because its implementation was prohibited by law, specifically, federal agency approval had not been granted. *Id.*

¶23. This Court held that the chancellor erred in dismissing the complaint, noting that the contract did not contain a provision making government approval a condition precedent for Green's performance. *Id.* at 79. The Court began its analysis by recognizing "[t]he mere fact that a contract becomes burdensome or even impossible to perform does not for that reason alone excuse performance." *Id.* at 78. Moreover, if a contingency may be guarded against by the parties in the contract, i.e., it is foreseeable or within the control of one of the parties, its occurrence will not discharge the parties' obligations under the contract. *Id.* As the Court explained, "where a party, by his own contract, engages to do an act, it is deemed to be his own folly, that he did not thereby expressly provide against contingencies, and exempt himself from liability in certain events . . . ." *Id.* Finally, the Court, relying upon *Piaggio*, restated the only three exceptions which will relieve a party from performance under the doctrine of impossibility. *Id.* at 78-79.

¶24. In the present case, the parties could have guarded against the 1987 amendments. Surely the contract could have been worded to terminate should the City's right of eminent domain be lost or substantially changed by the Legislature or otherwise.

¶25. Applying the Restatement's provision regarding impracticability due to a governmental order or regulation, "[i]f the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made," 4-County maintains it would not have entered into the contract had it known of the future changes to the statute. But is performance "impracticable"? Discussing impracticability, comment d to Restatement § 261 provides:

> Performance may be impracticable because extreme and unreasonable difficulty, expense, injury, or
> loss to one of the parties will be involved. A severe shortage of raw materials or of supplies due to

war, embargo, local crop failure, unforeseen shutdown of major sources of supply, or the like, which either causes a marked increase in cost or prevents performance altogether may bring the case within the rule stated in this Section. Performance may also be impracticable because it will involve a risk of injury to person or to property, of one of the parties or of others, that is disproportionate to the ends to be attained by performance. However, "impracticability" means more than "impracticality." A mere change in the degree of difficulty or expense due to such causes as increased wages, prices of raw materials, or costs of construction, unless well beyond the normal range, does not amount to impracticability since it is this sort of risk that a fixed-price contract is intended to cover.

¶26. It is still quite possible for 4-County to perform. It may sell its rights and facilities subject to Commission approval. Performance by 4-County is not impracticable or impossible. Rather, the statute grants 4-County new rights and it presumably now deems the contract detrimental. It made a contract, which at the time of formation, was to its benefit. Now that circumstances have changed, 4-County seeks to avoid performing under the contract.

¶27. Mississippi has recognized the doctrine of impossibility but not the doctrine of impracticability. However, the trend appears to be toward treating these doctrines similarly, and many courts even use the terms interchangeably. Indeed, Comment d to Restatement § 261 explains "[a]lthough the rule stated in this Section is sometimes phrased in terms of 'impossibility,' it has long been recognized that it may operate to discharge a party's duty even though the event has not made performance absolutely impossible. This Section, therefore, uses 'impracticable,' the term employed by Uniform Commercial Code S 2-615(a), to describe the required extent of the impediment to performance*." See also **The Opera Co. of Boston, Inc. v. The Wolf Trap Foundation for the Performing Arts**, 817 F.2d 1094, 1100 (4th Cir. 1987) ("[a] thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can only be done at an excessive and unreasonable cost."); **Commonwealth Edison Co. v. Allied-General Nuclear Servs.**, 731 F. Supp. 850, 855 (N.D. Ill. 1990) (discussing the common law doctrine of impossibility and noting that it is "today often called 'impracticability'"); **United States v. Conservation Chem. Co.**, 661 F. Supp. 1416, 1422 (W.D. Mo. 1987) ("[t]he doctrine of impossibility has been tempered to some degree by characterizing it as 'impracticable.'").

¶28. **Pelaggio** requires that the subsequent change in the law make performance under the contract "illegal." Here, performance is not necessarily illegal. 4-County and/or the City would simply be required to follow the procedures established in the amended statute concerning annexation. It would not be illegal unless Commission approval was not obtained.

¶29. Neither is performance "impracticable." It is, perhaps, less profitable for 4-County.

   *2. Frustration of Purpose*

¶30. The doctrine of frustration of purpose excuses performance by a party where the value of the performance to at least one of the parties, and the basic rationale recognized by both parties entering into the contract, has been destroyed by a supervening and unforeseen event. 18 Williston on Contracts § 1935 (3d ed. 1978). The Restatement of Contracts § 265, Discharge by Supervening Frustration, provides,

   Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event and the nonoccurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or

the circumstances indicate the contrary.

Section 265 requires that three criteria must be met before courts will find frustration of purpose. First, the purpose that is frustrated must have been a principal purpose of that party in making the contract. The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense. Second, the frustration must be substantial. It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss. The frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract. Third, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made. Restatement (Second) of Contracts § 265 cmt. a (1981).

¶31. What distinguishes frustration of purpose from the defense of impracticability is that in a true case of frustration, it is not that either party's performance has become impossible or significantly more difficult than originally contemplated. Rather, the party seeking discharge on frustration grounds can still perform under the contract, but no longer has the motivation to do so which originally induced its participation in the bargain. Nicholas R. Weiskop, *Frustration of Contractual Purpose -- Doctrine or Myth?*, 70 St. John's L. Rev. 239, 240 (1996).

¶32. This Court has not recognized frustration of purpose as a defense to a breach of contract action. In *United States v. Moulder*, 141 F.3d 568 (5th Cir. 1998), the Fifth Circuit Court of Appeals considered the frustration doctrine within the context of a criminal plea agreement. Lonnie Moulder and Steven Heiden pled guilty to a firearm offense in exchange for the government's promise "not [to] pursue any other charges . . . arising directly out of the facts and circumstances surrounding this offense or any other offense of which the United States is currently aware." *Id.* at 570. Moulder and Heiden successfully challenged their convictions based on an intervening change in the law under which their conduct was no longer considered criminal. The district court vacated the convictions but, that same day, Moulder and Heiden were indicted on the drug charges that, under the plea agreement, had not been pursued earlier. *Id.*

¶33. Relying upon Section 265 of the Restatement, the court held that the government's contractual obligations under the agreement were discharged under the frustration of purpose doctrine. *Id.* at 572. The court explained, "[t]he comments to this section provide that 'the purpose that is frustrated must have been a principal purpose of that party in making the contract. . . . The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense." *Id.* (quoting Restatement (Second) of Contracts § 265 cmt. a (1981)). Finding that the underlying purpose of the plea agreement was to avoid the uncertainty of a jury verdict and to ensure that the defendants served time for the firearms offenses, the court noted that "[a] basic assumption underlying the parties' purposes was their belief that the conduct . . . amounted to a violation of § 924(c)". *Id.* Because the parties' assumptions and obligations were altered by a subsequent United States Supreme Court decision and successful challenges to the statute under which the defendants were convicted, the court held "the underlying purpose of the [plea] agreement [was] frustrated and the basis of the government's bargain [was] destroyed. Thus, under the frustration of purpose doctrine, the government's plea agreement obligations became dischargeable."

¶34. In the instant case, 4-County contends that it has satisfied the three criteria for finding frustration of purpose. First, the purpose that is frustrated must have been a principal purpose of 4-County in making the contract. 4-County claims that its purpose in entering into the Service Area Agreement was to avoid the costs associated with a protracted eminent domain proceeding when the City's acquisition of its service

rights and distribution facilities was unavoidable. After all, the time and expense of such a proceeding would surely be substantial. The City, however, refers to the agreement itself, arguing that the parties' purpose in entering into the agreement was "[t]o avoid wasteful duplication of facilities and uneconomic service to ultimate consumers; and . . . to prevent wasteful investments and uneconomic service arrangements in the operation and extension of their respective distribution systems."

¶35. Second, the frustration must be substantial. Is it "so severe that it is not fairly to be regarded as within the risks that 4-County assumed under the contract?" This likely goes to the foreseeability of the 1987 amendments. As with the impossibility defense, "if a contingency may be guarded against by the parties in the contract, i.e., it is foreseeable or within the control of one of the parties, its occurrence will not discharge the parties' obligations under the contract." *Green*, 618 So. 2d at 78.

¶36. Finally, the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made. Again, 4-County maintains that it would not have entered into the contract if it had known of the 1987 amendments. The City's possessing an absolute right to take 4-County's service rights and distribution facilities was something 4-County contends it assumed would not change. Clearly, however, 4-County knew that it was within the power of the legislature to change the law. It could have but failed to condition the continued effectiveness of the contract upon the availability of eminent domain.

**c.**

¶37. The City acknowledges that the Public Service Commission must approve its purchase of 4-County's service rights and distribution facilities. However, it disagrees with the trial court's holding to the extent that the court found that in order for the Public Service Commission to approve the purchase, it must first determine that 4-County was not providing "reasonably adequate" service in the area. The City agrees such a finding would be required if it were attempting to acquire 4-County's service rights and distribution facilities through its right of eminent domain. However, the City claims that it is not attempting to exercise the right of eminent domain and therefore, §§ 77-3-17 and 77-3-21 are inapplicable to the present case. Rather, the City contends it is attempting to acquire the property through a "voluntary sale" as provided for in the Service Area Agreement. It notes "the use of Starkville's power of eminent domain was obviously unnecessary because 4-County had previously agreed to voluntarily sell Starkville any of its service rights or distribution facilities found within any newly annexed territory."

¶38. A utility may sell its certificate of public convenience and necessity or any substantial part of its property subject to Commission approval. Miss. Code Ann. § 77-3-23. If, following a hearing, the Commission determines "that the transaction is proposed in good faith, that the proposed assignee, lessee, purchaser or transferee, is fit and able properly to perform the public utility services . . . and that the transaction is otherwise consistent with the public interest, it may enter an order approving and authorizing such sale . . . upon such terms and conditions as it shall find to be just and reasonable and with such modifications as it may prescribe." *Id.*

¶39. Though the chancellor did not characterize this case as an "eminent domain" action, his statement that "Starkville makes no claim as to the inadequacy of the service of Four County" suggests he may have treated it as such. However, this action is more properly characterized as a breach of contract action wherein the City seeks to specifically enforce its agreement with 4-County to purchase its service rights and distribution facilities upon annexation of an area within 4-County's service area.

¶40. Miss. Code Ann. § 77-3-23 allows a utility to sell its certificate of public convenience and necessity subject to Commission approval. Moreover, § 77-5-231(c) (2000) grants a utility the power to dispose of property, tangible or intangible, while subsection (h) allows the utility "[t]o make any and all contracts necessary or convenient for the full exercise of the powers in this article granted, including, but not limited to, contracts with . . . [a] municipality for the purchase or sale of energy and/or the acquisition of all or any part of any system . . . ."

¶41. We have determined that the contract is enforceable. Accordingly, the review conducted by the Commission should be in keeping with the requirements of a negotiated sale rather than those of eminent domain.

**d.**

*1. Board Approval Under Section 77-5-237(6)*

¶42. The chancellor relied upon Miss. Code Ann. § 77-5-237(6) (2000) in finding that the promise made by 4-County in 1963 to sell unknown distribution facilities in the future was illegal. He explained, "Four County could only sell at that future time if its members should vote to sell or its future board of directors in good faith should then find (1) the sale to be in the best interest of Four County and (2) the other facts necessary for the sale to be authorized by law. . . . The Four County promise was illegal."

¶43. Miss Code Ann. § 77-5-237(6) provides that non-profit electric power associations formed under § 77-5-205 may sell property. It states, "[t]he board of directors may, without authorization by the members, sell, mortgage, lease or otherwise encumber or dispose of (a) any of its property which, in the judgment of the board, is neither necessary nor useful in operating and maintaining the corporation's system and which in any one (1) year shall not exceed ten percent (10%) in value of all of the property of the corporation . . . ."

¶44. The City maintains that 4-County's board of directors as it existed in 1963 made the requisite findings mandated by Section 77-5-237. The City relies on the provision in the agreement which recites the parties' purpose in forming the agreement, alleging it constitutes a finding by 4-County's board of directors that continuing to maintain and operate its distribution system within the municipality would be "neither necessary nor useful in operating the corporation's system."

¶45. 4-County responds that its 1963 board of directors could not make a contract to sell "undetermined facilities and rights in undetermined areas at undetermined times in the future at undetermined prices." 4-County notes that it is impossible to determine the propriety of a sale if the facts surrounding it are unknown.

¶46. The only Mississippi case discussing Section 77-5-237 is inapplicable, as it discusses a director's breach of his fiduciary duty. ***McNair v. Capital Elec. Power Ass'n***, 324 So. 2d 234 (Miss. 1975). However, in ***Humble Oil & Ref. Co. v. State***, 206 Miss. 847, 41 So. 2d 26 (1949), this Court held that where the terms of the county board of supervisors and the county superintendent of education expired on December 31, 1947, they could not renew existing oil and gas leases which expired on April 7, 1948. The Court explained, "[h]ere the terms of office of the members of the board and of the county superintendent of education expired December 31, 1947, yet they attempted to make a contract to go into effect during the term of their successors, preempting the latter from their right and duty to attend to the matter themselves."

¶47. The chancellor relied upon ***Humble Oil*** in finding that:

a board of supervisors may not bind itself or its successors by contract from their right and duty to exercise the power given by statute, whenever, in its judgment or discretion it is deemed necessary to exercise a clearly granted power. That principle is applicable to the exercise of power granted to both Starkville and Four County as regards their respective duties as fiduciaries providing electric power to their respective customers. Both public utilities are owned by their user members or their user citizens. Neither board could bind their successor boards with regard to future decisions on the subject matters of certificates of public convenience and necessity and of franchises.

The City distinguishes *Humble Oil*, arguing that the rule is applicable only to a county board of supervisors, and not to 4-County's board of directors as 4-County is a private non-profit corporation, not a governmental body. *See NLRB v. Natchez Trace Elec. Power Ass'n*, 476 F.2d 1042 (5th Cir. 1973).

¶48. Other courts have considered whether a board of directors' entry into a contract for an indefinite period of time unreasonably binds the hands of future directors. In *Tuscon Fed. Sav. & Loan Ass'n v. Aetna Inv. Corp.*, 245 P.2d 423, 428 (Ariz. 1952), the Arizona Supreme Court upheld a contract under which the defendant Savings and Loan Association agreed to buy exclusively from the plaintiff all insurance policies it required in connection with its business notwithstanding the fact that the contract bound the defendant corporation beyond the terms of its officers and directors who were acting when the contract was signed.

¶49. Some courts, however, have invalidated contracts which extend beyond the terms of the then-acting board of directors. Those cases involve employment contracts whereby the corporate officers have attempted to employ a person for a period extending beyond their terms. *See Massman v. Louisiana Mfg. Cooperage Co.*, 149 So. 886, 1002 (La. 1933); *Clifford v. Firemen's Mut. Benev. Ass'n*, 249 N.Y.S. 713, 714 (N.Y. App. Div. 1931); *Edwards v. Keller*, 133 S.W.2d 823, 825-26 (Tex. Ct. App. 1939); *Kline v. Thompson*, 240 N.W. 128, 131-32 (Wis. 1932).

¶50. In *Tuscon Fed.*, the Arizona Court explained, "[i]t is the policy of the law as well as the courts to hold corporations to their contracts the same as natural persons. . . . This was not an employment contract, but an agreement to purchase a commodity, i.e., insurance. A natural person could have made such a long term contract and we see no reason why this corporation should not also be permitted to do so." *Id.* at 428. Notably, the Arizona Supreme Court later stated that its comments regarding employment contracts in *Tuscon Fed.* were dicta. *Hernandez v. Banco De Las Americas*, 570 P.2d 494, 497 (Ariz. 1977). In that case, the court upheld a contract under which the board of directors of the defendant bank entered into a one-year contract with the plaintiff's predecessor that extended beyond the term of board. The court held that the contract operated as an informal modification or waiver of bylaws providing that officers would serve for a one year term and at the pleasure of the board of directors. *Id.*

¶51. We conclude that there are no statutory or other legal impediments to the 4-County board's approval of the contract in question.

### 2. Illusory Promise

¶52. Additionally, the chancery court found "Starkville's promise to buy what the Four County Board of Directors could not sell without on each occasion exercising their independent judgment as trustees for the membership was illusory. In 1966 the legislature added the requirement of the participation of the Public Service Commission in any sale of a public utility's certificate. . . ." The City contends the chancellor erred in

its finding, as it was bound by its promise to either purchase 4-County's service rights and distribution facilities or to grant 4-County a franchise. Similarly, it maintains 4-County could either sell its right and facilities or accept the franchise.

¶53. This Court has stated, "[b]y the phrase 'illusory promise' is meant words in promissory form that promise nothing; they do not purport to put any limitation on the freedom of the alleged promisor, but leave his future action subject to his own future will, just as it would have been had he said no words at all." *Krebs ex. rel. Krebs v. Strange*, 419 So. 2d 178, 182 (Miss. 1982) (quoting Corbin on Contracts, § 145 at 211 (1952)). In *Strange*, the Court held that an insurer's promise not to offer to renew the insurance contract upon the termination of the present policy was illusory. *Id.* at 183.

¶54. The City's promise to either purchase 4-County's service rights and distribution facilities or grant 4-County a franchise is not illusory. In this conclusion, the court erred.

**e.**

¶55. The City contends the chancellor erred in determining that the contract provision granting 4-County a "twenty year no cost" franchise was illegal. Alternatively, it maintains that even if that contract provision is illegal, the agreement does not fail. It cites numerous cases in which courts have enforced a valid contract provision while at the same time invaliding an illegal provision.

¶56. The chancellor relied upon 1942 Code provisions in determining that the City's promise to grant 4-County an exclusive franchise for twenty years at no cost was illegal when made in 1963. Section 7716-05(e) of the 1942 Code, now codified at Miss. Code Ann. § 77-3-17, provided that "[a]ny co-operative which shall operate within any area of a municipality shall likewise pay such municipality two per cent (2%) of the co-operative's gross revenue from sales to residential and commercial customers within said municipality." Similarly, municipalities were prohibited from granting any firm or corporation an exclusive franchise. Section 3374-85, now Miss. Code Ann. § 21-27-1 (2001), stated "[n]o municipality shall have the power to grant to any person, firm or corporation any exclusive franchise or any exclusive right to use or occupy the streets, highways, bridges, or public places in such municipality for any purpose. . . . " Finally, Miss. Code Ann. § 21-13-3 (2001) requires a vote by municipal residents before a municipality may grant a franchise. "In addition, every franchise or grant of any kind to use or occupy the street, highway, bridges, or other public places of such municipality to any inter-urban or street railway, railroad, gas works, water works, electric light or power plant, heating plant, telephone or telegraph system, or other public utility operating within such municipality must be approved by the passage of the ordinance granting same by a majority of the qualified electors of such municipality voting thereon at a general or special election." *Id.*

¶57. The City asserts that the agreement does not grant an "exclusive" franchise and that there is no prohibition against it waiving the 2% fee prescribed in Miss. Code Ann. § 73-7-17. It does not respond to the argument that a referendum is required under Miss. Code Ann. §  21-13-3.

¶58. The City maintains, however, that even if the provision regarding the grant of an exclusive, no cost franchise is illegal, the court may still enforce the provision regarding its purchase of 4-County's rights and facilities. It relies upon *Charles Weaver & Co. v. Phares*, 185 Miss. 224, 188 So. 570 (1939), where this Court held that "[w]here (as here) an agreement founded on a legal consideration contains several promises, or a promise to do several things, and a part only of the things to be done are illegal, the promises which can be separated, or the promise, so far as it can be separated, from the illegality, may be valid." *See also*

***Transamerica Ins. Co. v. Avenell***, 66 F.3d 715, 722 (5th Cir. 1995) (holding under Texas law, where subject matter of contract is legal, but contract contains illegal provision, illegal provision may be severed and valid portion enforced); ***Smith v. Orkin Exterminating Co.***, 791 F. Supp. 1137, 1142 (S.D. Miss. 1990) (provision of extermination contract that established one-year limitations period for instigating suit, in violation of Mississippi law, did not make contract's limitation of liability clause unenforceable, where clauses were not mutually dependent, and allegedly unenforceable clause could be severed from remainder of contract without reforming substance of contract). We apply the principles enunciated in ***Phares***, 188 So. at 570, and conclude that the franchise provision is not void as illegal.

**f.**

¶59. The chancellor also invalidated the agreement because it contained a provision requiring arbitration. The chancellor found that "[t]he attempt to enter into a contract of binding arbitration without a right of revocation before the arbitration award is returned, was contrary to law in 1963. . . . The result is that the 1963 agreement was not a binding contract to buy and sell. That a 1998 contract agreeing to set a purchase price by arbitration might be binding need not be addressed."

¶60. In support of his determination, the chancellor cited ***Machine Prods. Co. v. Prairie Local Lodge No. 1538***, 230 Miss. 809, 94 So. 2d 344 (1957). The City claims this Court's decision in ***[IP Timberlands Operating Co. v. Denmiss](#)***, 726 So. 2d 96 (Miss. 1998) overruled ***Machine Prods. Co***. It notes that ***Denmiss*** involved a 1945 agreement to arbitrate. Therefore, the City maintains that if a 1945 agreement to arbitrate was valid then surely the 1963 Service Area Agreement containing an arbitration provision is valid as well.

¶61. To the extent the chancellor relied upon ***Machine Prods. Co. v. Prairie Local Lodge***, 230 Miss. 809, 94 So. 2d 344 (1957), he was in error. ***Denmiss*** involved an agreement between Southern Kraft Timberland Corporation, a division of International Paper Corporation, and Denkmann Lumber Company whereby Kraft leased approximately 140,000 acres of Mississippi land from Denkmann. Kraft also leased approximately 95,000 acres of Louisiana land from Denkmann under another lease agreement. International Paper subsequently sued to confirm its property rights under the agreements which contained arbitration clauses.

¶62. On appeal, this Court began by recognizing the principles established in ***Machine Prods. Co.***:

> It is settled at common law that a general agreement, in or collateral to a contract, to submit to final determination by arbitrators the rights and liabilities of the parties with respect to any and all disputes that may thereafter arise under the contract is voidable at will by either party at any time before a valid award is made, and will not be enforced by the courts, because of the rule that private persons cannot, by a contract to arbitrate, oust the jurisdiction of the legally constituted courts . . . Whether the foregoing rule, which has variously been attributed to early jealousy of the courts concerning the exclusiveness of their jurisdiction and to considerations of public policy, rests on a satisfactory basis has been questioned, but it has been so long settled that the courts are unwilling to disturb it.

***Id.*** at 103 (quoting ***Machine Prods. Co. v. Prairie Local Lodge No. 1538***, 230 Miss. 809, 94 So. 2d 344, 348 (1957)). However, this Court recognized a contrary line of case law that had existed in Mississippi since at least 1917. ***Id.*** "This state, as a matter of public policy, has long allowed parties to arbitrate their differences and to give effect to an arbitration award." ***Id.*** at 104 (citing ***Scottish Union &***

*Nat'l Ins. Co. v. Skaggs*, 114 Miss. 618, 75 So. 437, 438 (1917)). The Court recognized that in 1948, it had previously held that "Articles of agreement to arbitrate, and awards thereon are to be liberally construed so as to encourage the settlement of disputes and the prevention of litigation, and every reasonable presumption will be indulged in favor of the validity of arbitration proceedings." *Id.* (quoting *Hutto v. Jordan*, 204 Miss. 30, 36 So.2d 809, 812 (1948)). Accordingly, the Court overruled the line of case law that prohibited agreements to arbitrate.

¶63. In the instant case, the chancellor's reason for invalidating the agreement was that the arbitration provision did not allow "a right of revocation" before the arbitration award was returned. Though *Denmiss* overrules *Machine Prods.*, it does not address the right of revocation.

¶64. The City also argues that the Federal Arbitration Act clearly approves agreements to arbitrate. The Federal Arbitration Act provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (1976). In *Denmiss*, this Court held that because the agreements concerned the leasing of timberlands, they "evidence[d] a transaction in interstate commerce." 726 So. 2d at 107 (quoting *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 867 F.2d 809, 813 n.4 (4th Cir. 1989)). The Court explained, "that the timber industry, on a national level, meets the minimum threshold of affecting or bearing upon interstate commerce, and thus initiating the Federal Arbitration Act." *Id.*

¶65. An agreement between a municipality and a rural electric cooperative concerning the purchase of service rights and distribution facilities within a single Mississippi county likely does not "affect or bear upon interstate commerce." Nevertheless**,** we hold that the presence of an arbitration clause does not render the contract illegal. We need not and do not pass upon the question of the extent to which the arbitration clause is enforceable.

**g.**

¶66. The chancellor found that the Service Area Agreement was perpetual and thus, unenforceable:

> The language in the agreement in 1963 providing for the agreement to last as long as either party, both public utilities, and their successors and assigns shall provide electricity within their jurisdictions, causes the agreement to be intended to be either perpetual, determinate upon a highly unlikely event not reasonably foreseeable or indeterminate and therefore terminable at will or after a reasonable time. The Court finds that the intent of the parties, determined from the language in the agreement and the existing law which was incorporated therein, was to agree to agree in the future so as not to have to litigate in a condemnation trial and to settle their disputes as to their sole issue, just compensation, either by negotiation or arbitration at that time. . . . Perpetual contracts by municipalities are generally considered invalid.

¶67. In making his decision, the chancellor relied upon *Echols v. New Orleans, Jackson, & Great*

***N.R.R.***, 52 Miss. 610 (1876) wherein this Court held that a contract entered into to furnish articles or supplies at a specified price, and without limit as to duration, will not be construed as a perpetual contract but rather as terminable at the pleasure of either party, or that the thing to be done shall be performed within a reasonable time.

¶68. The City contends the court ignored the plain language of the contract providing it would remain in effect "as long as either of the parties hereto shall distribute electricity in the area of service herein described . . . ." It relies upon several authorities in support of its assertion that "as long as the termination date of the contract is fixed on the happening of a stated event, the duration is fixed with sufficient certainty no matter how uncertain the occurrence of the event may be." *See **Jordon v. Mallard Exploration, Inc.***, 423 So. 2d 896, 898 (Ala. Civ. App. 1982) (a contract for permanent employment will last as long as the employer shall be engaged in business and has work for the employee to do).

¶69. Under Mississippi law contracts for an indefinite period are terminable at will by either party upon giving reasonable notice to the other party. ***American Chocolates, Inc. v. Mascot Pecan Co., Inc.***, 592 So. 2d 93, 95 (Miss. 1991) (agreement between American Chocolates and Mascot Pecan that if American Chocolates secured Henco as a customer of Mascot Pecan's products then American Chocolates would be paid a commission of five percent on the sales price of all products sold by Mascot Pecan to Henco); ***Hazell Machine Co. v. Shahan***, 249 Miss. 301, 318-19,161 So. 2d 618, 624 (1964) (an oral contract entered into between a manufacturer and a dealer for the handling of manufacturer's rebuilt motors was subject to termination by either party at will by giving of reasonable notice where no time limitation was fixed in the contract). By contrast, contracts that are intended to last forever are not terminable at will. ***Gerachi v. Sherwin-Williams Co.***, 156 Miss. 36, 125 So. 410, 411 (1930) (the contract made in 1926 was not to be performed within any definite specified time, but was to endure forever, subject to the payment of indebtedness incurred thereunder).

¶70. Resolution of this issue depends upon whether the contract is for an indefinite period or whether it was intended to last forever. Continuing until either party ceases to distribute electricity within the area could conceivably last forever. It is certainly terminable upon the occurrence of a specific event, the cessation by either party of offering electrical service in the area. That is not an indefinite period such that the contract is terminable at will.

**h.**

¶71. The chancellor found,

> Assuming the parties' agreement to submit the determination of the purchase price to arbitration, was designed to determine the just compensation due for the purchase, and the Court so finds, no monetary profit or loss was intended to be occasioned to either party by their promises. Therefore the agreement created no monetary benefit of bargain to either party other than the foregoing of litigation expenses to both in the event of any future annexation. Four County's argument as to damage to the remainder of its customers would be a proper consideration by the arbitrators, and the result to Starkville would be to prevent the passing on to its customers of any savings by way of lesser rates as the loss to rural customers would necessarily be passed on to the urban customers.

The City explains its motives in entering into the agreement from the words of the contract itself as to "avoid wasteful duplication of facilities and uneconomic service arrangements . . . ." Moreover, it contends that

simply because there was no monetary benefit, that fact alone does not invalidate the agreement. We do not assume that maintaining or acquiring a customer base is without economic consequences. The grant of summary judgment is not affirmable on that basis.

### i.

¶72. The City contends that the chancellor erred in refusing to specifically enforce the Service Area Agreement based on one sentence in the chancellor's opinion which provided "[The Agreement] certainly is not such an agreement as should be specifically enforced in equity." We hold that the contract is valid. While we need not discuss the appropriate remedy at this juncture, we do not view the verbiage of the chancellor's opinion to preclude consideration of specific performance as the appropriate remedy. We leave that to the chancellor on remand.

### j.

¶73. The City contends the court erred in finding that it would be against public policy to award actual damages against a rural cooperative. It claims that damages should be awarded against 4-County the same as any other Mississippi corporation. The City cites cases in which 4-County was sued and ordered to pay monetary damages. Those cases, however, involve individual plaintiffs injured by 4-County's power lines. *See **4-County Elec. Power Ass'n v. Clardy***, 221 Miss. 403, 73 So. 2d 144 (1954); ***Gifford v. Four-County Elec. Power Ass'n***, 615 So. 2d 1166 (Miss. 1992).

¶74. The chancellor found that,

> Legal damages for breach of contract payable by one public utility to another public utility to the ultimate prejudice of one group of public consumers for the benefit of another group, are not a proper form of relief in this case, and such a result is certainly one which the Public Service Commission is charged to prevent by virtue of the necessity of their required approval of any acquisition of a certificate of public convenience and necessity whether by sale or cancellation for condemnation. . . . Any award of legal damages would also violate public policy and therefore be unconscionable.

The chancellor cited no authority for his finding other than public policy and a desire to avoid the utility's passing the costs of litigation on to its customers.

¶75. Miss. Code Ann. § 77-5-231(a) provides that a non-profit rural electric association may "sue and be sued." Implicit in the ability to be sued is the fact that damages may be awarded against the utility. Moreover, the statute does not prohibit a suit by one utility against a non-profit rural electric association.

### III.

¶76. For the foregoing reasons, the summary judgment is reversed, and this matter is remanded to the chancery court for further proceedings consistent with this opinion.

¶77. **REVERSED AND REMANDED.**

> **PITTMAN, C.J., SMITH, P.J., WALLER, EASLEY, CARLSON AND GRAVES, JJ., CONCUR. McRAE, P.J., AND COBB, J., CONCUR IN RESULT ONLY.**

1. This Court held that the amendments were constitutional in ***Cities of Oxford, Carthage, Louisville,***

*Starkville & Tupelo v. Northeast Miss. Elec. Power Ass'n*, 704 So. 2d 59 (Miss. 1997).

2. Miss. Code Ann. § 75-2-615 (1972) recognizes "excuse by failure of presupposed conditions" as excusing a seller from timely delivery of goods under a contract where his performance has become commercially impracticable because of unforeseen supervening circumstances not within the contemplation of the parties at the time of contracting. There are no Mississippi cases construing the statute.