914 So.2d 779 (2005)
JACKSON MOTOR SPEEDWAY, INC., Appellant
v.
D.L. FORD, James M. Ford and The Ford Company, Appellees.
No. 2004-CA-00628-COA.
Court of Appeals of Mississippi.
November 8, 2005.
*780 Bradley Barron Vance, Kenneth Charles Miller, Michael Verdier Cory, attorneys for appellant.
Michele Dawn Biegel, B. Ruth Johnson, attorneys for appellees.
EN BANC.
ISHEE, J., for the Court.
¶ 1. The Appellees, D.L. Ford, James M. Ford, and The Ford Company ("Fords"), filed suit against the Appellant, Jackson Motor Speedway ("JMS"), seeking damages and partial rescission of an agreement for the sale and purchase of assets ("agreement") previously executed by the parties. After trial on the merits, the Chancery Court of the First Judicial District of Hinds County granted judgment in favor of the Fords. From that decision JMS timely appeals.

FACTS
¶ 2. On November 10, 1995, the Fords entered into an agreement for sale and purchase of assets with JMS. Within the agreement, the Fords conveyed to JMS buildings, equipment, and other property which the Fords had previously owned and operated as a quarter mile dirt track under the name "Jax Tracks." Because the property being conveyed was landlocked, the agreement also necessarily included the grant of an easement across certain real property, also owned by the Fords. The easement granted to JMS crosses railroad tracks owned by the Illinois Central Railroad Company ("ICRC").
¶ 3. While under the operation of JMS, there have been at least three train/vehicular accidents on the easement. At least one of these accidents is the subject matter of a pending lawsuit against JMS. On April 12, 2002, the Fords notified JMS by letter that they were unilaterally terminating a portion of the easement due to JMS's failure to use and maintain a portion of the easement. On April 17, 2002, the Ford's filed their complaint for breach of agreement and discharge of performance, for temporary restraining order without notice, preliminary injunctive relief, and other relief. Pursuant to Rule 56(b) of the Mississippi Rules of Civil Procedure, the chancery court entered a temporary restraining order barring JMS from conducting races until April 30, 2002.
¶ 4. On May 1, 2002, the Fords and JMS entered into an agreed order that allowed JMS to continue to use the easement and stated (1) that JMS would have two law enforcement personnel present and directing traffic at the railroad crossing on the easement; (2) that there be two million dollars of liability insurance covering the facility; and (3) that JMS agree to indemnify and defend the Fords for any liability occurring from the use of the easement for *781 racing purposes. On May 8, 2002, JMS entered into an agreed preliminary injunction which allowed JMS to use and operate the raceway and all easements until a trial upon the merits or, upon motion, by further order of the chancery court.
¶ 5. On December 16 and 17, 2003, this matter was tried before Chancellor Patricia D. Wise. On March 14, Judge Wise entered her order and opinion, finding that the easement granted to JMS was rescinded as to the general public, and granting the Fords $38,674.30 in attorneys' fees. Aggrieved by this decision, JMS asserts the following errors on appeal: (1) whether there was sufficient evidence to support the chancery court's conclusion that JMS committed a material breach of any maintenance obligation; (2) whether there was sufficient evidence to support the chancery court's conclusion that JMS committed a material breach by not following any possible rules or regulations of the ICRC; (3) whether the trial court erred in finding that the agreement was severable and that the easement could be partially rescinded; (4) whether the Fords materially breached the terms of the agreement; and (5) whether JMS was entitled to recover attorneys' fees.

ISSUES AND ANALYSIS

I. Whether there was sufficient evidence to support the chancery court's conclusion that JMS committed a material breach of any maintenance obligation.
¶ 6. JMS asserts on appeal that the chancellor erred when she concluded that JMS committed a material breach of the agreement by failing to satisfy its maintenance obligations. We will not disturb a chancellor's findings unless they were manifestly wrong, clearly erroneous, constituted an abuse of discretion, or the court applied an erroneous legal standard. Sanderson v. Sanderson, 824 So.2d 623, 625-26(¶ 8) (Miss.2002). Questions of law are reviewed de novo. Carter v. Carter, 735 So.2d 1109, 1114(¶ 20) (Miss.Ct.App.1999).
¶ 7. JMS argues that the plain language of the maintenance provision found in the agreement requires JMS to maintain the easement, subject only to its sole discretion, only to the extent that the maintenance allows the use of the easement for JMS and its guests. JMS further argues that it was under no affirmative duty to maintain the easement in any other manner, and that no evidence was put forth of any such duty or of any failure to comply with any such duty. According to JMS, no testimony was provided at trial that showed any failure by JMS to maintain the easement made it unusable or unpassable for guests of the speedway. The maintenance provision, found in paragraph six of the agreement, states:

Easement. The easement across Seller's property for ingress and egress for the use by Buyer and its guests shall be maintained entirely by Buyer. Buyer shall hold Sellers harmless from and pay all costs of litigation arising out of use of this easement by Buyer and its guests. If the easement is not used for a period of twelve months, it will terminate. This easement will also be subject to any and all prior easements of record. The gates on the easement will be locked at all times when not in use by Buyer. Buyer will furnish keys to the locks on gates to Sellers for their use. Sellers will reserve unto themselves, their heirs and assigns the right to use the easement.
¶ 8. The Fords argue that the plain terms of the language in the provision makes clear the degree of JMS's duty to maintain the easement. The Fords argue as follows:

*782 Simple grammar reveals the prepositional phrase "across (the Ford's) property for ingress and egress for use by (JMS) and its guests" describes the easement, not determining the degree by which JMS shall maintain the easement. The simple sentence is "[t]he easement ... shall be maintained entirely by (JMS)." The verb "maintain" is defined in Merriam-Webster's Collegiate Dictionary, Tenth Edition: "1. To keep in an existing state ...: preserve from failure or decline."
According to the Fords, the clear intent of the easement provision was that the easement be maintained by JMS in the same condition as when granted in the agreement. The Fords further contend that JMS failed to maintain the easement in the same condition as when granted due to several facts. At trial, the Fords presented videotapes that depicted flooding caused by clogged culverts. According to the Fords, some of the flooding that occurred arose after JMS was ordered to clean the culverts by an agreed preliminary injunction. The Fords presented testimony that prior to their agreement with JMS, they cleaned the culverts on the easement two to three times per year as chronic flooding had been a problem since 1995. However, the testimony at trial established that the culverts were only cleaned by JMS once between May 2002 and December 2003, and only because JMS was ordered by the court to do so. Furthermore, the Fords imbedded a stop sign in concrete that also served as a gate post that allowed the easement to be locked off. At some time during the JMS's management of the easement, the gate post was knocked over by a collision. As of the date of this appeal, the stop sign and post had not been replaced. Furthermore, despite the injunction against JMS, it did not clean the debris from the numerous accidents that occurred at the intersection of the easement and the train tracks. Finally, the Fords presented evidence that JMS had failed to prevent overgrowth from vegetation and that no action had been taken to level a dip in a portion of gravel on the easement that can cause large vehicles to become stuck momentarily on the tracks.
¶ 9. In response to the Fords' contention that the failures of JMS to maintain the easement constitute a material breach of the agreement, JMS argues that the agreement "states nothing about grading, trimming, cutting, replacing broken gates, locks, culverts, drainage to be maintained, or guards to be posted." Taken most literally, the language of the agreement indicates that the duty placed upon JMS was only that JMS maintain the easement in a manner that allows ingress and egress for its patrons. Any failure by JMS to exceed the bare minimum required for ingress and egress, while possibly contributing to vehicle/train collisions, cannot be deemed to be a material breach of the terms of the agreement. While we find that the language of the agreement provision clearly favors JMS's construction, we note that the language of the enforcement provision provides some support for the contention of the Fords. However, even if the provision is to be deemed ambiguous, no material breach could have occurred. "In ascertaining the intention of the parties from the language of the instrument, the grant or reservation should be so construed as to carry out that intention, and, in case of ambiguity or doubt, a grant or reservation of an easement ordinarily will be construed in favor of the grantee." Boggs v. Eaton, 379 So.2d 520, 522 (Miss.1980). For these reasons, we find the trial court's findings clearly erroneous and in manifest error, and must reverse and render the finding that JMS committed a *783 material breach of the maintenance provision.

II. Whether there was sufficient evidence to support the chancery court's conclusion that Jackson Motor Speedway committed a material breach by not following any possible rules or regulations of the Illinois Central Railroad Company.
¶ 10. JMS alleges that the chancellor erred by concluding that JMS committed a material breach by failing to comply with any rules or regulations of the ICRC. JMS further asserts that the chancellor erred by finding that the railroad had a rule or regulation requiring that two crossing guards be posted at the intersection on race days, and that JMS was the party responsible for providing the guards. JMS purports that the only example of a rule or regulation put forth to establish the existence of ICRC rules was an unexecuted, undisclosed, and unauthenticated license between the ICRC and the Fords. JMS argues that the chancellor erred in entering the agreement into evidence due to the lack of authentication, and that the Fords failed to create a question of fact as to this issue. Finally, JMS argues that the Fords failed to disclose the existence of any such duty to JMS.
¶ 11. The Fords assert that JMS has failed to cite authority within its appellate brief in violation of M.R.A.P 28(a)(6). JMS argues in its reply brief that "where the assignments of error are factual, no legal citation is required." Ironically, JMS provides no citation support for this reply contention either. "It is well established that appellate courts in Mississippi will not review any issues on appeal if the party fails to cite relevant support of his or her arguments." Lambert v. Lambert, 872 So.2d 679, 682(¶ 14) (Miss.Ct.App.2003). In light of this authority, we are under no duty to discuss whether the agreement between the Fords and JMS created a duty whereby JMS was required to comport with some known or unknown rule or regulation of the ICRC. We therefore affirm the chancellor's finding as to this issue.

III. Whether the trial court erred in finding that the agreement was severable and that the easement could be partially rescinded.
¶ 12. According to JMS, the chancellor committed reversible error in finding that the various provisions of the agreement were themselves severable, and therefore, that a partial recision of the agreement was proper. The conclusion of the chancery court was that there were two distinct promises within the agreement. The chancellor found that the first promise consisted of the purchase of the property. According to the chancellor, the second promise consisted of the grant of an easement in order to facilitate ingress and egress to the purchased property. The Fords argue that partial rescission of the contract was warranted, as the promises in the agreement were separate and divisible. According to the Fords, the plain terms of the agreement show that the consideration paid by JMS was for the land, and that no allocation of the purchase price was explicitly applied towards the use of the easement.
¶ 13. Rescission of a contract is allowed in cases of fraud, mistake, or material breach. Cenac v. Murry, 609 So.2d 1257, 1273 (Miss.1992). Assuming that the chancellor was correct in finding that JMS committed a material breach of the contract, rescission may have been a proper remedy. In the case sub judice, the chancellor granted only a partial rescission of the contract.

*784 [I]t is a well settled principle, that a court of equity will never decree a partial rescission of a contract; and especially where, as in this case, the complainant insists that the contract is entire, and incapable of apportionment, and that the illegality, upon which the rescission is asked, goes to the whole consideration of the contract.
Hamilton v. McGill, 352 So.2d 825, 829 (Miss.1977) (citation omitted).
¶ 14. A severable contract "includes two or more promises, each of which can be enforced separately, so that failure to perform one of the promises does not put the promisor in breach of the entire contract." BLACK'S LAW DICTIONARY 264 (7th ed. 2000). Whether a contract is severable is a question of intention, to be determined from the language which the parties have used, and the subject matter of the agreement. Mariana v. Hennington, 229 Miss. 212, 90 So.2d 356, 364 (1956). While a literal reading of the provisions of the agreement relating to the assets purchased under the contract did not explicitly state that any portion of the purchase price was in consideration for the easement, it did provide that JMS would acquire from the Fords "certain tangible and intangible assets." We can only rationally conclude that JMS intended that the purchase price of the land included a portion of the consideration to be applied towards the grant of the easement. That JMS would be allowed use of the easement for the ingress and egress of race patrons is implicit within the agreement. Furthermore, by allowing the rescission of the easement portion of the agreement, the chancellor has countermanded purpose of the underlying agreement. If this contract is to be rescinded, it must be rescinded as a whole. Furthermore, we surmise that a complete rescission would not be palatable to either party to this action. Therefore, we suggest that some other means of compensation, such as a monetary damages figure, be established. Having found that the chancellor committed manifest error, we reverse and remand the partial rescission of the easement.

IV. Whether the Fords materially breached the terms of the agreement.
¶ 15. JMS next argues that the Fords breached the agreement by wrongly enjoining and restraining JMS from access and quiet enjoyment of its property. JMS has failed to cite relevant authority for this assertion, and it is otherwise without merit. We therefore affirm the judgment of the chancellor.

V. Whether JMS was entitled to recover attorneys' fees.
¶ 16. JMS argues on appeal that it, and not the Fords, was entitled to attorney's fees. This contention is without merit, and we affirm the judgment of the chancellor.
¶ 17. THE JUDGMENT OF THE HINDS COUNTY CHANCERY COURT IS AFFIRMED IN PART, REVERSED AND REMANDED IN PART, AND REVERSED AND RENDERED IN PART. ALL COSTS OF THIS APPEAL ARE ASSESSED IN EQUAL PARTS TO THE APPELLANT AND APPELLEES.
KING, C.J., LEE AND MYERS, P.JJ., BRIDGES, CHANDLER, GRIFFIS AND BARNES, JJ., CONCUR. IRVING, J., DISSENTS WITHOUT SEPARATE OPINION. *785-787