# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2018-CA-00302-SCT

*WATKINS DEVELOPMENT, LLC, AND FARISH
STREET GROUP, LLC*

*v.*

*JACKSON REDEVELOPMENT AUTHORITY,
CENTRAL MISSISSIPPI PLANNING AND
DEVELOPMENT DISTRICT, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/30/2017 |
| TRIAL JUDGE: | HON. J. DEWAYNE THOMAS |
| TRIAL COURT ATTORNEYS: | MARK D. HERBERT |
| | PERNILA STIMLEY BROWN |
| | CHAD J. HAMMONS |
| | MICHAEL MADISON TAYLOR, JR. |
| | SAMUEL L. BEGLEY |
| | LANCE L. STEVENS |
| | W. DAVID WATKINS |
| | ROBERT L. GIBBS |
| | ROBERT GREGG MAYER |
| | JAMES W. SHELSON |
| | BENJAMIN LYLE ROBINSON |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | W. DAVID WATKINS |
| | ROBERT L. GIBBS |
| ATTORNEYS FOR APPELLEES: | MARK D. HERBERT |
| | GINNY Y. DELIMAN |
| | JAMES W. SHELSON |
| | PERNILA STIMLEY BROWN |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 10/03/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, C.J., ISHEE AND GRIFFIS, JJ.**

**ISHEE, JUSTICE, FOR THE COURT:**

¶1.     The Jackson Redevelopment Authority (JRA) leased several parcels along Farish Street in Jackson to the Farish Street Group (FSG).  In exchange for a long-term lease and other favorable terms, FSG was given a set period of time to renovate the properties and to sublet them to retail establishments.  Watkins Development, which owned half of FSG, contracted with FSG to do the renovations.  The plan was to build an entertainment district on Farish Street, but after a few years only a fraction of the renovations were done, and none of the properties were occupied by tenants.  JRA terminated the lease, and this litigation followed.  The Hinds County Chancery Court ultimately found that the lease was properly terminated, that no party had shown it was entitled to money damages, and that Watkins Development could not take a mechanic's lien on the property.  We find no error and affirm.

## FACTS

¶2.     The Farish Street project began more than two decades ago.  Between 1997 and 2001, the Jackson Redevelopment Authority acquired properties along Farish Street.  In March 2002, JRA entered into a lease with Performa Mississippi, LLC, to develop the area into the "Farish Street Entertainment District."  But after six years, Performa had failed to move forward with any significant development.

¶3.     During the summer of 2008, David Watkins and his company Watkins Development formed Farish Street Group, LLC, to take over the project.  On June 17, 2009, Performa assigned the lease to FSG.  FSG and JRA then executed an amended lease agreement on January 27, 2010.  The same day, Watkins Development entered into an agreement with FSG

2

to perform nearly all of the construction and development required by the amended lease. The construction was funded in part by a $5.4 million loan from the State.

¶4.     The amended lease agreement laid out detailed and specific deadlines FSG was required to meet to refurbish and sublet the properties. It was uncontested that none of the deadlines were met, and after three years none of the properties had been sublet.

¶5.     On July 13, 2013, JRA's board voted to terminate the lease as to some of the parcels for "failure to commence and/or complete construction or renovation of improvements." On July 26, 2013, JRA gave written notice of the termination as to those parcels. On September 25, 2013, JRA gave written notice of the termination of the rest of the parcels, effective October 5, 2013. And on October 7, 2013, JRA sent another letter confirming that the lease was "fully and finally terminated." JRA's letters cited FSG's "failure to commence and/or complete construction or renovation of improvements."

¶6.     On October 3, 2013, another contractor hired by FSG, Dale Partners Architects, filed a mechanic's lien on the properties in the amount of $322,180.26.[1] Four days later, Watkins Development filed a mechanic's lien claiming that $4,757,484.33 was owed. JRA sued to expunge the liens.

¶7.     On July 24, 2014, JRA filed a motion for partial summary judgment asking the court to declare both liens invalid. On July 23, 2015, the chancellor granted the partial summary-judgment motion, holding that the liens were invalid as a matter of law. The chancellor

---

[1] Dale Partners also filed a separate suit against FSG in circuit court.

declined to award punitive damages, however, finding that the liens had not been filed "with a bad purpose, an evil purpose, without ground for believing the act to be lawful."

¶8.    After a trial, the chancellor found that the lease was properly terminated, but he denied monetary damages to JRA because of the delay in terminating the lease and the valuable improvements that had been made to the properties. The chancellor also denied any monetary award to FSG because it had not proved "any specific monetary amount which has been gained by JRA due to FSG's actions." Dale Partners Architects did not appeal the expungement of its lien.

## DISCUSSION

### 1.    Materiality of Breach of Lease

¶9.    Farish Street Group admits it breached its development obligations under the lease, "early and often," as the chancellor found. But the developers assert FSG substantially complied with the lease, and consequently the chancellor was required to reinstate it. The developers contend that the timetables were "arbitrary" and "political cover" and that they were "assured time and time again that the timetable would be modified, as needed, to fit the realities of the market conditions and the progress of the development." The developers maintain that market conditions were difficult and that there were unexpected construction delays, but they say they worked hard to secure investment and to proceed with the development to the extent it was possible. They give varying figures for the total investment, but they assert it was more than $10 million.

4

¶10.    The developers argue that FSG's failure to complete the construction on time was not a material breach of the lease and that substantial compliance with the construction requirements of the lease would have rendered FSG's breaches immaterial and not a basis to terminate the lease.  "Rescission of a contract is allowed in cases of fraud, mistake, or material breach."  *Daniels v. Crocker*, 235 So. 3d 1, 17 (Miss. 2017) (internal quotation marks omitted) (quoting *Jackson Motor Speedway, Inc. v. Ford*, 914 So. 2d 779, 783 (Miss. Ct. App. 2005)).  The remedy for a breach of contract that is not material is money damages, not rescission.  *Id.*  This Court has said,

> The termination of a contract is an "extreme" remedy that should be "sparsely granted."  [citations omitted].  Termination is permitted only for a material breach.  A breach is material when there "is a failure to perform a substantial part of the contract or one or more of its essential terms or conditions, or if there is such a breach as substantially defeats its purpose," *Gulf South Capital Corp. v. Brown*, 183 So. 2d 802, 805 (Miss. 1966), or when "the breach of the contract is such that upon a reasonable construction of the contract, it is shown that the parties considered the breach as vital to the existence of the contract," *Matheney v. McClain*, 248 Miss. 842, 849, 161 So. 2d 516, 520 (1964).

*J.O. Hooker & Sons, Inc. v. Roberts Cabinet Co.*, 683 So. 2d 396, 402–03 (Miss. 1996) (alteration in original) (quoting *UHS-Qualicare v. Gulf Coast Cmty. Hosp., Inc.*, 525 So. 2d 746, 756 (Miss. 1987)).  In the particular context of a lease,

> A tenant's right to possession may not be conditioned on perfect performance of the lease but may be forfeited only upon a material breach or a violation of a substantial obligation . . . .  A tenant's immaterial or trivial breach, or a relatively minor failure of performance on the part of one party, does not justify a forfeiture of the lease.

52 CJS *Landlord and Tenant* § 189 (2019) (footnotes omitted) (citations omitted), Westlaw.

¶11. At the outset, we note that the developers assert the chancellor found they had substantially complied with the lease, but the chancellor never made such a finding. Instead, the chancellor observed that FSG had *claimed* substantial compliance under the lease. But the chancellor rejected the claim.

¶12. "A chancellor's findings of fact will not be disturbed unless they are manifestly wrong or clearly erroneous, or unless the chancellor applied an erroneous legal standard." ***Stover v. Davis***, 268 So. 3d 559, 563 (Miss. 2019) (internal quotation marks omitted) (quoting ***Wright v. Roberts***, 797 So. 2d 992, 997 (Miss. 2001)). The developers criticize the chancellor's decision on both factual and legal grounds, but we find that they have failed to show any error. First, they point out that the chancellor did not discuss their substantial-performance argument at length; he noted the argument had been made and then rejected it, saying only that he "had no basis upon which to reinstate the lease." The chancellor then said that it was "clear FSG failed to meet all the provisions and deadlines contained in the lease, thereby breaching same." According to the developers, the chancellor erroneously held that the lease could be terminated as a result of any violation, however trivial. But the chancellor actually was referring to monetary damages, as evidenced by the next sentence: "However, this Court further finds no merit in JRA's request for damages, costs, and attorney's fees." We are satisfied that the chancellor did not apply an erroneous legal standard as to the materiality of the breach.

¶13. Since there has been no showing the chancellor applied an erroneous legal standard, the materiality of the breach was a question of fact for the chancellor and is subject to a

6

deferential review by this Court. *See **Sanford v. Federated Guar. Ins. Co.***, 522 So. 2d 214, 217 (Miss. 1988). "A chancellor's findings of fact will not be disturbed unless they are manifestly wrong or clearly erroneous . . . ." ***Stover v. Davis***, 268 So. 3d 559, 563 (Miss. 2019) (internal quotation marks omitted) (quoting ***Wright v. Roberts***, 797 So. 2d 992, 997 (Miss. 2001)).

¶14.    On the merits of their materiality argument, the developers assert that FSG performed substantial work on the properties: it spent millions of dollars on construction and development. This argument misses the mark, as "substantial performance" is a legal term of art meaning "performance of all important particulars . . . ." ***Garner v. Hickman***, 733 So. 2d 191, 196 (Miss. 1999) (quoting ***Bevis Constr. Co. v. Kittrell***, 243 Miss. 549, 139 So. 2d 375, 379 (1962)). In the context of a lease,

> The factors set forth in the Restatement of Contracts (Second) for determining whether a failure to render or offer performance is material should be applied in determining triviality or immateriality of a tenant's breach of a commercial lease for the purposes of determining whether to enforce a forfeiture. These factors are: (1) the extent to which the injured party will be deprived of the benefit that he or she reasonably expected; (2) the extent to which the injured party can be adequately compensated for the part of that benefit of that he or she will be deprived; (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (4) the likelihood that the party failing to perform or to offer to perform will cure his or her failure, taking account of all the circumstances, including any reasonable assurances; and (5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

52 C.J.S. *Landlord & Tenant* § 189 (2019) (footnotes omitted) (citations omitted), Westlaw.

Thus, substantial performance is not obtained simply by spending a substantial amount of money, but, rather, is judged by how close the tenant came to meeting its obligations under

7

the lease. On this point, the developers offer little substantive argument. Their brief makes a few conclusory claims that the JRA did not take deadlines seriously and mentions only some of FSG's obligations, in a footnote and without any details regarding deadlines. This briefing is inadequate to meet the developers' burden to show error on appeal. *See Rosenfelt v. Miss. Dev. Auth.*, 262 So. 3d 511, 519 (Miss. 2018). The question of the materiality of the breach is fact-intensive, and it is not this Court's responsibility to construct an argument for the developers or to pore through the voluminous record seeking support for their generalized assertions. To do so would be to "act as an advocate for one party to an appeal," something this Court will not do. *Id.* (quoting *Jefferson v. State*, 138 So. 3d 263, 265 (Miss. Ct. App. 2014)).

¶15.    But the lease laid out specific timetables for each of the twelve parcels, with the final objective of completing tenant improvements, through which the property was to be ready for occupancy by the ultimate retail subtenants. The final tenant improvements for the first parcel were required to be completed in late 2010, and the tenant improvements on the last parcel were required to be completed by June 2013. JRA sought to terminate the lease in July 2013. At that point, no final tenant improvements had been completed, and fewer than half of the properties were ready for tenant improvements. It was not clear how close any of the properties actually were to being ready for retail subtenants. At the time the lease was terminated, little if any construction had been completed in more than a year, and little prospect of imminent progress had been made. Meanwhile, the developers were trying to negotiate a new master plan for the development. Under these circumstances, we cannot say

8

the chancellor was manifestly wrong or clearly erroneous in finding FSG's breaches material. *Stover*, 268 So. 3d at 563.

### 2. Estoppel

¶16. The developers next contend that JRA was estopped from terminating the lease because it waived its right to terminate following FSG's initial breaches. "[I]t is simple contract law that a party may waive the protections of any provision of a contract." *Sanderson Farms, Inc. v. Gatlin*, 848 So. 2d 828, 837 (Miss. 2003). And a landlord who waives the right to terminate in response to a tenant's breach may be estopped from later terminating the lease. *E.g.*, *Bennett v. Waffle House, Inc.*, 771 So. 2d 370, 373 (2000).

¶17. On this point, the chancellor did find that JRA had waived breaches since shortly after the amended lease was signed—this was the reason the chancellor did not award JRA damages. Still, the developers' argument on this point is cursory and it suffers from the same defect as the materiality-of-the-breach issue discussed above: the developers fail to discuss the specifics about what the lease required FSG to do (or, indeed, what they actually did). They simply assert that JRA should have been estopped from terminating the lease because FSG first breached it three years before JRA finally acted. This briefing is inadequate to meet the developers' burden to show error on appeal. *See Rosenfelt*, 262 So. 3d at 519.

¶18. That being said, the record offers little support for the developers' position. As noted above, FSG may have missed deadlines from the beginning, but it was actively working on the project for about a year and a half after the amended lease was signed. After construction stopped, FSG continued to promise it would complete the project, but it never did.

9

¶19. The lease here contained an anti-waiver clause, and JRA argues that clause should preclude a finding of waiver, citing *Kirkland v. Chinita Land Development, Inc.*, 798 So. 2d 620, 623-24 (Miss. Ct. App. 2001). *Kirkland* did hold that an antiwaiver clause precluded a finding of waiver. *Id.* But the Court of Appeals cited no authority, and its decision appears to contradict, without explanation, the majority view that non-waiver provisions can themselves be waived, like any other provision of a contract. *See* 13 *Williston on Contracts* § 39:36 (4th ed. 2019) ("The general view is that a party to a written contract can waive a provision of that contract by conduct despite the existence of a so-called antiwaiver or failure to enforce clause in the contract."), Westlaw. We do not adopt the holding of *Kirkland*, but we observe that the antiwaiver clause *is* relevant in deciding the effect of the prior waivers:

> Where the cause of forfeiture is a continuing breach or the breach of a continuing covenant, such as the breach of a covenant as to the use of the premises, or the cause of forfeiture is a continuing breach of a covenant to repair, or of a covenant to pay rent, the waiver of one breach, as by the acceptance of rent accruing after the breach, does not destroy the breached condition or covenant, or waive subsequent breaches thereof, such waiver discharging only the particular breach. This rule is especially applicable where the lease expressly provides that the waiver of any breach should not be deemed a waiver of a subsequent breach.

52 C.J.S. *Landlord & Tenant* § 202 (2019) (footnotes omitted) (citations omitted), Westlaw.

The lease here had an express antiwaiver clause:

> 27.5 One or more waivers of any covenant, term or condition of this lease agreement by either party shall not be construed as a waiver of a subsequent breach of the same covenant, term or condition. . . . Landlord's failure to insist upon the strict performance of any provision hereof, or to exercise any option or remedy contained herein, shall not constitute a waiver thereof or of any provision, option, right or remedy in the future. . . . Failure to declare any Event of Default immediately upon occurrence, or delay on taking any action or remedy in connection therewith, shall not waive the Event of Default nor

10

require the giving of any further notice or opportunity to cure prior to exercise of remedies.

¶20.    Finally, we observe that "'[t]he law does not regard estoppels with favor, nor extend them beyond the requirements of the transactions in which they originate.'" *PMZ Oil Co. v. Lucroy*, 449 So. 2d 201, 206 (Miss. 1984) (quoting *McLearn v. Hill*, 177 N.E. 617 (Mass. 1931)).

¶21.    We conclude that the developers have failed to show that the chancellor abused his discretion in holding that JRA's initial forbearance did not preclude it from terminating the lease.

### 3.    Equitable Compensation for Improvements

¶22.    The developers claim, in the alternative, that if JRA properly terminated the lease, they are entitled to an equitable remedy for the valuable improvements that were done to the properties and were forfeited as a result of their failure to finish construction.  The chancellor found that the developers had failed to offer adequate proof of the value of the improvements.  As noted above, the developers discussed their expenditures at length, but they make no effort to show that the expenses were commercially reasonable and they neglect to say what, if any, value the work added to the property.

¶23.    We affirm the chancellor's decision for a different reason: the contract provided that the improvements would become the property of the JRA and that no compensation would be provided in the event the lease was terminated early.  "Where there is a contract, parties may not abandon same and resort to quantum meruit." *Sentinel Indus. Contracting Corp. v. Kimmins Indus. Serv. Corp.*, 743 So. 2d 954, 970 (Miss. 1999) (internal quotation marks

11

omitted) (quoting *Redd v. L & A Contracting Co.*, 246 Miss. 548, 151 So. 2d 205, 208 (1963)). Likewise, this Court has held that damages for unjust enrichment are not available when there is a contract between the parties; it "applies to situations 'where there is *no legal contract* and "the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another."'" *Ground Control, LLC v. Capsco Indus., Inc.*, 120 So. 3d 365, 371 (Miss. 2013) (quoting *Powell v. Campbell*, 912 So. 2d 978, 982 (Miss. 2005)).

¶24.     Moreover, the general rule at common law is that fixtures to the land, placed there by the tenant, become part of the realty and thus the property of the lessor. *Wright v. Rub-a-Dub Car Wash, Inc.*, 740 So. 2d 891, 896 (Miss. 1999). The traditional common-law rule is applied leniently to tenants, especially in the commercial leasing context. *Simmons v. Bank of Miss.*, 593 So. 2d 40, 42 (Miss. 1992). But this leniency takes the form of enforcing contracts: "for well over a century, we have accepted that lessor and lessee may agree among themselves regarding title to and removal of improvements and may reflect their wishes in formal agreements this Court will enforce." *Id.*

¶25.     The contract in this case expressly provided that the improvements would be constructed at FSG's "sole cost, risk and expense" and that the improvements "shall be surrendered to and become the absolute property of Landlord upon the expiration or earlier termination of the Lease Term without any compensation owing to Tenant, any Subtenant or any other person or entity therefor."

¶26.     We affirm the chancellor's decision.

### 4. Impossibility & Impracticality

¶27. The developers next contend they were excused from the construction deadlines because of impossibility or impracticality of performance. "'[W]here the law casts a duty on a party, the performance shall be excused[] if it be rendered impossible by the act of God.'" *Hendrick v. Green*, 618 So. 2d 76, 78 (Miss. 1993) (quoting *Browne & Bryan Lumber Co. v. Toney*, 188 Miss. 71, 194 So. 296, 298 (1940)). But "[t]he mere fact that a contract becomes burdensome or even impossible to perform does not for that reason alone excuse performance." *Hendrick*, 618 So. 2d at 78 (citing *Toney*, 194 So. at 298). So "'when a party by his own contract creates a duty or charge upon himself he is bound to discharge it, although to do so should subsequently become unexpectedly burdensome or even impossible; the answer to the objection of hardship in all cases such being that it might have been guarded against by proper stipulation.'" *Id.* (quoting *Toney*, 194 So. at 298). Our courts have noted three cases in which impossibility may excuse performance:

1. A subsequent change in the law, whereby performance becomes unlawful.

2. The destruction, from no fault of either party, of the specified thing, the continued existence of which is essential to the performance of the contract.

3. The death or incapacitating illness of the promisor in a contract which has for its objective the rendering of personal services.

*Id.* at 78-79 (quoting *Toney*, 194 So. at 298).

¶28. The developers cite a few circumstances they claim made performance impossible: first, one of the buildings was discovered to have a construction flaw that cost $1.5 million

13

to remedy; second, various funding difficulties were caused by the state of the economy and the economic realities of development in downtown Jackson.

¶29. That one of the buildings might have structural faults was surely within the realm of foreseeability and could have been (and indeed was) dealt with by the contract: it expressly provided that the expense and the *risk* of the construction would be borne by FSG. FSG knew about the state of the economy when it agreed to the amended lease in 2010. And, regardless, the general state of the economy cannot be a basis to excuse performance of a contract under Mississippi law. *Hendrick*, 618 So. 2d at 79. We affirm the chancellor's judgment.

### 5. Good Faith and Fair Dealing

¶30. Next, the developers contend JRA breached its implied duty of good faith and fair dealing by terminating the lease and by dismissing FSG's proposed new master plan without seriously considering it. They also point to the JRA's vigorous litigation of the dispute.

¶31. It is true that "[a]ll contracts contain an implied covenant of good faith and fair dealing in performance and enforcement." *Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss. 1992) (citing *Morris v. Macione*, 546 So. 2d 969, 971 (Miss. 1989); *UHS-Qualicare v. Gulf Coast Cmty. Hosp.*, 525 So. 2d 746, 757 n.8 (Miss. 1987); *Blue Cross & Blue Shield of Miss., Inc. v. Maas*, 516 So. 2d 495, 498 (Miss. 1987); *Perry v. Sears, Roebuck & Co.*, 508 So. 2d 1086, 1089 (Miss. 1987); Restatement (Second) of Contracts § 205, 99 (1979)). But as to the termination of the lease, JRA could not have acted in bad faith when its actions were authorized by the contract. *See Limbert v. Miss. Univ. for Women Alumnae Ass'n, Inc.*,

14

998 So. 2d 993, 999 (Miss. 2008). As to the failure to consider the new master plan, it was tendered after years of breaches by JRA and was withdrawn a few weeks later following another change of plans. And the developers point to no instances of bad faith in JRA's conduct of this or other litigation.

¶32. We find this issue without merit.

### 6. Validity of Watkins Development's Lien

¶33. The developers also argue the chancellor erred in expunging Watkins Development's lien on the subject properties. The developers frame this as their first issue, one of great public importance and a question of first impression in which this Court should decide whether to except public property from mechanic's liens if the property is used in a commercial or proprietary capacity,[2] as opposed to purely public or governmental functions.

¶34. It should be noted that the Legislature overhauled the mechanic's lien statute in 2014, enacting Mississippi Code Sections 85-7-401 to 85-7-433. Before 2014, Section 85-7-131 would have controlled.[3] The lien here was filed in 2013.

¶35. This Court has previously held, without exception, that public property is not subject to a mechanic's lien. In *First National Bank v. Monroe County*, this Court stated unequivocally that "[i]t is settled beyond controversy in this state that laborers, materialmen, and subcontractors have no lien against the state or a county or public body for labor or

---

[2] Black's Law Dictionary defines "proprietary capacity" as "used to describe functions of a city or town when it engages in a business-like venture as contrasted with a governmental function." *Proprietary capacity*, Black's Law Dictionary (6th ed. 1990).

[3] The 2014 law amended Section 85-7-131 to only apply only to wells and some other structures.

material furnished on any public work." ***First Nat'l Bank v. Monroe Cty.***, 131 Miss. 828, 95 So. 726, 731 (1923) (citing ***McGraw v. Bd. of Supervisors of Winston Cty.***, 125 Miss. 420, 87 So. 897 (1921); ***U.S. Fid. & Guar. Co. v. Marathon Lumber Co.***, 119 Miss. 802, 81 So. 492 (1919); ***Nat'l Sur. Co. v. Hall-Miller Decorating Co.***, 104 Miss. 626, 61 So. 700 (1913); ***Panola Cty. v. Gillen***, 59 Miss. 198 (1881)). In 1929, this Court went so far as to declare, "This court had frequently theretofore held, and we here again say, that laborers and materialmen have no claim against the state or other public body, in the absence of a valid contract or statute so providing, for labor or material furnished for any public work." ***Miss. Fire Ins. Co. v. Evans***, 153 Miss. 635, 120 So. 738, 744 (1929) (citing ***First Nat'l Bank***, 95 So. 726; ***Marathon Lumber Co.***, 81 So. 492; ***McGraw***, 87 So. 897; ***Hall-Miller Decorating Co.***, 61 So. 700). In the more recent ***Key Constructors, Inc. v. H&M Gas Company***, we observed that "[t]he federal government and most states require that general contractors performing public construction projects procure bonds to secure the payment to laborers and materialmen, as public property is not subject to private lien rights." ***Key Constructors, Inc. v. H&M Gas Co.***, 537 So. 2d 1318, 1321 (Miss. 1989).

¶36. Courts around the country "are practically unanimous in holding that absent a specific statute, a mechanic's lien does not attach to buildings and property owned by a municipality and used for the benefit of the public." George L. Blum, Annotation, *Subjection of Municipal Property, or Alleged Municipal Property, to Mechanics' Liens*, 81 A.L.R. 6th 363 (2013), Westlaw.

¶37. The rule is sometimes articulated as being limited to "public property held for public use,"[4] and the developers point out that at least one court[5] has held that public property may be subject to a mechanic's lien when it is held in a proprietary capacity. In *Comstock & Davis, Inc. v. City of Eden Prairie*, 557 N.W.2d 213, 216 (Minn. Ct. App. 1997), the Minnesota Court of Appeals distinguished between a "public use" and a "public purpose," holding that lots sold by a city to private business enterprises may have been for a "public purpose" but were not a "public use" and were thus subject to mechanic's liens. *Comstock* is an outlier, and it is distinguishable because our urban renewal statute expressly provides that "the powers conferred by this article are for *public uses* and purposes . . . ." Miss. Code Ann. § 43-35-5 (Rev. 2015) (emphasis added). This Court has agreed, in the eminent-domain context at least, holding that urban renewal was a legitimate public use and purpose and that lands taken for redevelopment could later be leased or even sold to private parties because "private enterprise can be used to obtain the object of redevelopment." *Paulk v. Housing Auth. of the City of Tupelo*, 195 So. 2d. 488, 490 (Miss. 1967).

¶38. Mississippi's Urban Renewal Law expressly provides that

> [a]ll property of a municipality including funds, owned or held by it for the purposes of [the Urban Renewal Law] shall be exempt from levy and sale by

---

[4] *See, e.g., Morganton Hardware Co. v. Morganton Graded Sch.*, 64 S.E. 764, 765 (N.C. 1909).

[5] The developers cite one other case on this point, but it does not hold what they claim it does. In *American Seating Co. v. City of Philadelphia*, the Pennsylvania Supreme Court distinguished between public and proprietary functions, but that case concerned a lien on the *landlord's interest* in the property, i.e., the rent, not a lien on the property itself. *Am. Seating Co. v. City of Philadelphia*, 256 A.2d 599, 600 (Pa. 1969). The lien sought here was only on the properties themselves.

virtue of an execution, and no execution or other judicial process shall issue against the same nor shall judgment against a municipality be a charge or lien upon such property.

Miss. Code Ann. § 43-35-25(a) (Rev. 2015). The law limits judgments and liens to the "rents, fees, grants or revenues from urban renewal projects." *Id.* A creditor asserting a lien on real property under Section 85-7-131 was required to file a declaration on the lien within twelve months. Miss. Code Ann. § 85-7-141 (Supp. 2018). Thus, a mechanic's lien could not be enforced because the creditor would have to sue and secure a judgment, but Section 43-35-25(a) forbids the resulting judgment's being executed on municipal property held for purposes of the Urban Renewal Law.

¶39. We find no error in the chancellor's removal of the lien.

### 7.    Takings Clause

¶40. Finally, the developers contend JRA's actions amounted to an inverse condemnation under the Mississippi and United States Constitutions. This novel takings-clause claim receives only cursory argument and is supported by only the most general authorities. The developers' briefing is inadequate to meet their burden as appellants to show error on appeal. *See **Rosenfelt***, 262 So. 3d at 519.

### CONCLUSION

¶41. Because no error has been shown, we affirm the chancery court's judgment.

¶42. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN,  MAXWELL, BEAM, CHAMBERLIN AND GRIFFIS, JJ., CONCUR.**